HENRY WHITE AND ANOTHER, EXECUTORS *vs.* WILLIAM J. HOWARD AND OTHERS.

The capacity of a foreign corporation to take by devise in this state must be determined by the terms of its charter and the laws of this state; and the laws of the foreign state will not be recognized here as affecting the question.

A testator devised certain property to trustees in fee simple for the benefit of his daughter during her life, and in case of her decease without issue or husband surviving her, the trust fund to be divided equally among six benevolent and religious societies, *A, B, C, D, E,* and *F.* The will also provided that in case any of the societies was unincorporated, its share should be conveyed to the person who, when such conveyance was to be made, should be acting as its treasurer. The testator died in 1863, leaving no wife or parent, and only one child, the daughter above mentioned. The daughter died in 1865, leaving neither husband nor children. Of the societies named all except *F* were incorporated at the death of the testator. *D* was incorporated under a statute of the state of New York which provides that no person leaving a wife, child or parent, shall devise to any benevolent, charitable, scientific, or missionary society, more than one-fourth of his estate. *E* was incorporated by the legislature of the state of New York, with power to hold, purchase and convey real and personal estate, provided that its net income arising from real and personal estate should not exceed $10,000 annually. A statute of the state of New York provided that no devise to a corporation should be valid, unless such corporation were expressly authorized by its charter to take by devise. *F* was a voluntary association of individuals, having a constitution which defined its object to be "the diffusion of gospel truth in the southern and south-western states, to be accomplished under the direction of ecclesiastical bodies or missionary organizations of an evangelical character existing

within said states," and was duly organized under its constitution. Its operations were regularly carried on from its formation in 1853 until the 23d of April, 1861, when at a meeting of the executive committee it was voted "that we now deem it advisable to suspend operations, and do hereby suspend them, until our civil commotions shall cease, or until in some other way the indi ations of Providence beckon us forward." Active operations of the society ceased from that time, and no meeting was held until October, 1865, when a meeting was held to consider the expediency of reorganization. In pursuance of action taken at that meeting, the annual meeting was held in November, 1865, according to the requirement of the constitution, and officers including a treasurer were duly elected. In October, 1866, the society was duly incorporated. Held,

1. That on the death of the testator the legal title to the estate did not descend to the heirs at law, but was vested in the trustees, and was not divested by the death of the daughter, nor by any subsequent event.

2. That the devise to D was not in violation of the law of New York.

3. That the limitation of the net income of E was not a limitation on a bequest or devise.

4. That the devises to both D and E were valid according to the laws of this state; and that, in any event, E was entitled to the rights and privileges of a voluntary association, and that its treasurer could take under the will as trustee for the association.

5. That F was not dissolved by the vote of April 23d, 1861, and that the trustees must convey its portion under the will to the treasurer of the present incorporated society.

Whether the trust created by the devise to F was so uncertain that it could not be administered by a court of equity, quære.

Bill in Equity by the executors of the will of William Bostwick, praying for advice in the construction of the will; brought to the Superior Court in New Haven county, and reserved for advice on facts found by a committee. The material provisions of the will were as follows:

After the payment of certain legacies, amounting in the aggregate to $8,500, including a legacy of $1000 to the Southern Aid Society, all the residue of the testator's estate, both real and personal, was devised and bequeathed to certain trustees named, as joint tenants in fee-simple, as a trust fund to be applied for the benefit of the testator's daughter, Frances Howard Bostwick, during her life, but if the daughter should die leaving no husband or child or issue of any child surviving her, the trust fund was to be disposed of as follows: $22,000 to certain legatees named, and then whatever remained of the trust property was to be divided between six societies, viz: the

American Tract Society, the Southern Aid Society, the American and Foreign Christian Union, the American Colonization Society, the Trustees of the Board of Domestic Missions of the General Assembly of the Presbyterian Church in the United States of America, and the Board of Foreign Missions of the Presbyterian Church in the United States of America.

The will further provided that if any of the above named six societies should not be incorporated, the estate given by the will to such society should be conveyed, transferred and paid in fee-simple, to the person who when the estate was to be transferred according to the provisions of the will should act as treasurer of such society, to be appropriated to the charitable purposes of said society, and under its direction.

The parties respondents were the six societies named, who claimed each one-sixth of the residue of the estate; the heirs at law of the testator, who insisted upon the incapacity of those societies to take, and asserted their title to the residue, and the administrator and heirs at law of the daughter, Frances Howard Bostwick, who claimed that, the bequest to the societies failing, they, and not the heirs of William Bostwick, were entitled to the residue.

The facts as found by the committee are sufficiently stated in the opinion.

*H. White* and *J. S. Beach*, for the petitioners.

*Doolittle* and *L. H. Bristol*, for the heirs at law of the testator.

The principal questions arising upon the record are, 1. Does the will make a valid bequest of the residue to any of the six societies named as residuary legatees ? 2. In case of a failure on the part of all or any of the societies to take any portion of the estate attempted to be devised or bequeathed to them, to whom does the portion so failing pass ?

1. The American Tract Society is incapable of taking real estate in Connecticut by devise, and the residuary clause must fail so far as it attempts to devise real estate in this state to that corporation.

White *v.* Howard.

By the law of its creation, i. e. the law of the state of New York, this corporation was, at the time of the testator's decease, and also at the date of the daughter's death, incapable of taking any real estate by devise. By its charter the society is to possess the powers and be subject to the provisions of the general act of the state of New York respecting corporations. This act containing no prohibition in respect of the mode in which real estate may be acquired, confers no express authority to take by devise. The revised statutes of New York (2 Rev. Stat., p. 57, § 3) explicitly provide that "no devise to a corporation shall be valid, unless such corporation be expressly authorized by its charter or by statute to take by devise. It necessarily follows that this society, not being expressly authorized either by its charter or by the general act, has no capacity to take by devise. And so the courts of New York hold in cases involving the capacity of this society in this respect. *Downing* v. *Marshall*, 23 N. Y., 366, 383. The amended charter of the society does not help it. That act was passed March 31st, 1866; the daughter died on the 30th of August, 1865. Being a New York corporation, and by the laws of that state devoid of capacity or power to take by devise, no argument is needed to show its inability to take real estate in Connecticut by devise. An artificial being, the creature of the law which created it, it has no powers except such as are specially granted, or are necessary to carry into effect the granted powers. *New York Firemen Ins. Co.* v. *Ely*, 5 Conn., 560; *Town of Berlin* v. *School Society of New Britain*, 9 id., 180; *The People* v. *Utica Ins. Co.*, 15 Johns., 383; *Head* v. *Providence Ins. Co.*, 2 Cranch, 127; *Dartmouth College* v. *Woodward*, 4 Wheat., 518; *U. S. Bank* v. *Dandridge*, 12 id., 64; *Bank of Augusta* v. *Earle*, 13 Pet., 519, 587; *Runyan* v. *Coster's Lessee*, 14 id., 122. As the power to take real estate by devise was prohibited to this corporation by the law of the sovereignty creating it, it would be a breach of comity in our courts to permit it to take by devise here. Existing here as a corporation only by sufferance, our courts will not undertake to endue it with new or enlarged powers.

This society has no power or capacity to take either real estate or the bequest of personalty. Its charter provides that "the net income of said society arising from the real and personal estate shall not exceed the sum of $10,000 annually." The plain meaning of this provision is to limit the corporate capacity of the society to the acquisition of such an amount of real and personal estate as will produce a net income of $10,000, and to determine whether this limit has been reached the test must be the annual value of the estate, and not the income actually produced or received. In other words, the question is, has the society property of the clear yearly value of the sum named. Any other test would be clearly fallacious, and defeat the manifest intent of the legislature. The burden of proof is on the society to show its capacity, but apart from this the committee's finding demonstrates that the limit of corporate capacity on the part of this society to take and hold property has been reached.

2. The Southern Aid Society is incapable of taking any portion of the testator's real or personal estate under the will.

Both at the date of the testator's death and the daughter's decease, no such society, incorporated or otherwise, was in existence. The resolution of April 23d, 1861, was no mere suspension of the active operations of the society, but was that suspension of its very existence which is commonly termed death, and which worked an effectual dissolution of the society. Up to the date of that resolution the society was a voluntary association of individuals existing for charitable purposes, receiving and disbursing funds, with officers and agents and all the paraphernalia for a society actively carrying on its operations, and annually holding its meetings and electing its annual officers in accordance with the law of its constitution. From April 23d, 1861, these things ceased to be, its affairs were wound up, its funds disposed of, its organization abandoned, legacies to it suffered to lapse, the provisions of its constitution discarded, holding no meetings and electing no officers for a period of nearly five years. The "civil commotions" ceased, and still this state of inanition continued, and no "indications of Providence"

beckoned it forward, until the prospect of securing a portion of William Bostwick's estate galvanized the corpse into spasmodic activity.    Upon such a state of facts this court is called upon to resurrect this dead society, and to judicially declare that it was not dead, but only sleeping, during its five years' abandonment of every element of organization and association.    No necessity or reason for the continued existence of the society beyond the date of the resolution of 1861 is shown or suggested; its property was disposed of, its operations at an end, and while it is true that the organization might have been kept up had the members so willed it, the fact is apparent that it was abandoned.    This is not the case of a corporate body; that is a legal entity, deriving its life from the state, and once existing it ceases to exist only in the manner and by the mode which the law points out.    A voluntary association, on the other hand, such as this society was, derives its life only from the mutual agreement of its members, and the sole evidence of the continuance of this mutual agreement is found in the organization and operations of the society.    Abandon these, and the mere fact of abandonment in itself shows that the mutual agreement no longer continues to exist, and as a necessary consequence that the society itself has no longer an existence.    As a mere voluntary association resulting from mutual agreement it was in the power of the members composing it to form a new association for the same purposes at any future time, and this consideration is of itself sufficient to show that there was no intention to continue the existence of the society after the passage of the resolve in question.    *Penfield* v. *Skinner*, 11. Verm., 296; *Strickland* v. *Prichard*, 37 id., 324; *Slee* v. *Bloom*, 19 Johns., 456; *Bank of Poughkeepsie* v. *Ibbotson*, 24 Wend., 473; *Briggs* v. *Penniman*, 8 Cow., 387; *MacMahan* v. *Morrison*, 16 Ind., 172.

If the society should be held by the court to have had a continued existence down to the date of the daughter's death, yet the attempted gift of a share of the residue to the society must be held to be void.

The settled law in this state requires certainty in the per-

sons to be benefited, and an ascertained mode of selecting them if they are to be taken from a definite class. The English doctrine of charities and *cy pres* has no foundation in this state. *White* v. *Fisk*, 22 Conn., 573; *Treat's Appeal from Probate*, 30 id., 113. In the present case the beneficiaries are in the highest degree uncertain; they are the entire community in the southern and southwestern states within the influence of the society; the beneficiaries here are not ascertained, either as individuals or as a class of persons, so as to bring the case within the rule. *Bascom* v. *Albertson*, 34 N. Y., 584; *Downing* v. *Marshall*, 23 id., 382; *Owens* v. *Missionary Society of the Methodist Episcopal Church*, 14 id., 380; *Leonard* v. *Burr*, 18 id., 96; *Dodge* v. *Pond*, 23 id., 69; *Beekman* v. *Bonsor*, 23 id., 298.

3. The American and Foreign Christian Union is incapable of taking more than one-fourth of one-sixth of the residue of the testator's estate.

This society is a New York corporation, incorporated under its laws by the general act of 1848. The testator, having left a daughter surviving him, was restrained by the 6th section of that act from devising or bequeathing to societies like this more than one-fourth of his estate after payment of his debts, and this section being incorporated into the charter, in effect limits the capacity of the society to take. The testator did devise and bequeath his whole property to this and similar societies. He did leave a child, and the contingent devise was therefore immediately reduced to one-quarter of the whole, and to each one-sixth of one-quarter, and this was the full extent of corporate capacity which the American and Foreign Christian Union had to take under the will.

4. As to the inheritance. The heirs at law and next of kin of the daughter Frances Howard Bostwick can take no portion of the residue of the estate as to which the disposition fails. Their claim to inherit is based upon the fact that they are the heirs at law and the next of kin of the daughter, and they must inherit, if at all, through her, by showing that she in her lifetime, either under the will or as heir at law of her father, had an estate of inheritance in the portion of the estate

to which they claim to succeed. The claim of the heirs at law of the testator, on the other hand, is based upon two propositions. First, That the trust created for the life of Frances Howard Bostwick was valid, and during its continuance the whole estate was vested in the trustees. Second, That the whole estate being vested in the trustees for the whole term of Frances Howard Bostwick's life, she never had an estate of inheritance therein, and therefore her heirs could not and cannot take by descent from her.

The above propositions being admitted, it follows that the trust did not and could not terminate until the death of Frances. The trust having terminated, and Frances having died without issue, the contingency has happened upon which the testator has devised a portion of his estate to certain societies now found by law to be incapable of taking. It cannot therefore go to the societies, for they are wanting in capacity, nor to the daughter, for she is dead, nor to her heirs at law, for she was never in her life seized of any descendible estate in the property. It must therefore go to the heirs at law of the testator.

First, It will be conceded that the trust was a valid one under our statutes. There can be no question that the language of the devise is ample to convey the whole estate to the trustees. The residue of the estate is devised to them, as joint tenants in fee simple, and they are directed in certain contingencies to convey certain portions of the estate also in fee simple. The trust being a valid one, and the language used apt to vest in the trustees the whole estate during the continuance of the trust, we insist that the whole estate did vest in them during that period, because the nature of the trust required it, and because by such construction the clear intent of the testator in regard to the disposition of his property will be fulfilled.

The trust could not by any possibility terminate until the death of Frances Howard Bostwick, and during all that time the final disposition of the estate upon her death was contingent, and the whole estate remained in the trustees until that

event happened. So long as she lived it could not be said that the trust was invalid, or the remainder undisposed of by the will; that remainder was limited to certain societies upon her decease, and then and only then could it be known that any of them would be wanting in capacity to take. It was therefore necessary for the trustees to have the whole estate until her death, and it was not until her death that it appeared that the will could not have full effect. *Doe* v. *Edlin*, 4 Ad. & El., 582; *Doe* v. *Ewart*, 7 id., 636; *Doe* v. *Nicholls*, 1 Barn. & Cres., 341. That the nature of the trust requires that during their continuance the whole estate should vest in the trustees, is shown by the adjudged cases. *Stacey* v. *Rice*, 27 Penn., S. R., 75; *Kay* v. *Scates*, 37 id., 31; *Barnett's Appeal*, 46 id., 399; *Copp* v. *Town of Norwich*, 24 Conn., 28. The trust embraced the whole estate while it existed, and prevented any portion of the estate from vesting in the daughter. There being a valid intervening trust estate continuing during the whole of the daughter's life, the reversion did not vest until the termination of that estate by her death. *Harris* v. *Clark*, 3 Seld., 259; *Everitt* v. *Everitt*, 29 N. Y., 91; *DeBarante* v. *Gott*, 6 Barb., 492. The trust being a valid one, it suspended the power of alienation, and vested the whole estate in the trustees, and prevented the estate from descending to the heir at law or passing to the devisee. *Boynton* v. *Hoyt*, 1 Denio, 57; *Hawkins* v. *Chappel*, 1 Atk., 621; *Gibson* v. *Rogers*, Ambl., 93, 94, 96; *Hill* v. *Bishop of London*, 1 Atk., 618; *Cox* v. *Parker*, 22 Beav., 168; *Burgess* v. *Wheate*, 1 Eden, 177; *Bishop* v. *Curtis*, 17 Jur., 23.

The objection is made that such portion of the testator's estate as fails to pass to the societies is estate undisposed of by the will, and that therefore immediately upon the daughter's decease it vested in the daughter as intestate estate. The objection is unsound. During the whole continuance of Frances Howard Bostwick's life the estate was disposed of by the will; it was during that period vested in the trustees. Until the death of the daughter, and the consequent determination of the trust estate, it could not be known whether the testa-

tor's disposition of any part of the trust estate had failed. The capacity of the societies to take was to be ascertained at the daughter's death, so that until that period it was impossible to say that there was any " undisposed estate " to vest in her. During the whole life time of the daughter there was a valid contingent remainder outstanding, which prevented any fee from vesting in her. By the will an equitable life estate in the income was given to the daughter, remainder upon her decease to her children, if any, in fee. This was a valid contingent remainder, which would have vested in those children in fee immediately upon their birth. *Doe* v. *Perryn*, 3 T. R., 484 ; *Richardson* v. *Wheatland*, 7 Met., 169 ; *Carver* v. *Jackson*, 4 Pet., 90. The equitable life estate and this equitable remainder in fee to the children comprised the whole estate, and therefore no estate of inheritance could vest in the daughter during her life. So long as the contingent remainder of the whole estate was outstanding, the fee did not and could not vest until the contingency happened, viz., the death of the daughter. Where there is a contingent limitation in fee, no estate limited or arising afterwards can be vested. Cruise Dig., Title xvi., ch. 1, sec. 56 ; *Luddington* v. *Kime*, 1 Ld. Raym., 203 ; *Wendell* v. *Crandall*, 1 N. Y. 491, 2 Denio, 9 ; *Olney* v. *Hull*, 21 Pick., 311 ; *Snow* v. *Snow*, 49 Maine, 159 ; *Hubbard* v. *Rawson*, 4 Gray, 242 ; *Brown* v. *Lawrence*, 3 Cush., 390.

Whatever may be the construction given by this court to the trust created by the will and the estate thereby created, it is submitted that in this state, at all events, the daughter during her life time, never had a vested estate of inheritance in any portion of the estate. Strike out the trusts and you have an estate for life to Frances, remainder upon her decease to her issue, if any there be, but if she shall leave no issue, then to the six societies named. This limitation over to the societies in the event of the daughter's death without issue, was a contingent remainder in their favor, contingent upon the daughter's death without issue. This is well settled law in this state. *Smith* v. *Pendell*, 19 Conn., 107 ; *Hudson* v. *Wadsworth*, 8 id., 348.

The devise to any society failing, the daughter, as heir at

law, could take no greater estate than the society in whose place she is substituted, to wit, a contingent remainder. And this remainder did not and could not vest in her because it was a remainder contingent upon her own decease. So long as Frances lived there was a possibility of issue, and until her death it could not be known whether the remainder would ever take effect; it was a naked possibility. Upon her death the remainder vested, not in her for she was not *in esse*, nor in her heirs for they claim through her, and she never had a vested estate of inheritance. It must therefore vest in the heirs at law of the testator. Fearne on Rem., 364.

This court will so construe the will as to prevent intestacy as to any portion of the estate. 2 Redf. on Wills, p. 616; *Lett* v. *Randall*, 10 Sim., 112; *Archer* v. *Jegon*, 8 id., 446; *Abbott* v. *Middleton*, 21 Beav., 143; *Deakins* v. *Hollis*, 7 Gill & Johns., 311; *Pickering* v. *Langdon*, 22 Maine, 429.

The law is now settled that where an estate is given to trustees with directions upon the death of the life tenant to convey the estate to the testator's next of kin or heirs at law, or according to the statute of distributions, and the life tenant is the sole heir at law, then the estate is to be conveyed to those who at the expiration of the life estate are the heirs at law or next of kin of the testator. *Briden* v. *Hewlett*, 2 Mylne & Keen, 90; *Butler* v. *Bushnell*, 3 id., 232; *Miller* v. *Eaton*, G. Cooper, 272; *Godkin* v. *Murphy*, 2 Y. & C., 351; *Bird* v. *Wood*, 2 Sim. & Stu., 401. And the courts of Connecticut have intimated that they should adopt the same rule. *Huntington's Appeal from Probate*, 30 Conn., 533.

*D. B. Beach*, for the heirs at law of Frances Howard Bostwick.

In the construction of wills the intent of the testator is the leading inquiry. Such intent will always be carried into effect, whenever it can be consistently with the rules of law. Where the intent of the testator fails by reason of his having made illegal devises or bequests, or where he omits to dispose of any portion of his property, such real estate as is the subject of the illegal devise, or undisposed of, descends to

his heir at law, and such personalty as is the subject of the illegal bequest, or undisposed of, passes to his next of kin. The heir at law is never to be disinherited except by express words or clear implication, and however strong the will and intent of the testator may be to cut him off, it cannot prevail unless there be an operative gift away from him.

The will is ambulatory, and entirely inoperative until the death of the testator. It speaks from that time.

The entire income of the real and personal estate of the testator, which accrued after his death and during the life of his daughter, passed to her under the will. *Patterson* v. *Ellis' Executors*, 11 Wend., 259; *Farmers' and Mechanics' Savings Bank* v. *Brewer*, 27 Conn., 600. At the daughter's death such accumulated income constituted part of her personal estate, to which her nearest of kin succeeded.

In the event which has happened, the death of the testator's daughter with no husband or descendant surviving her, the testator intended to give, subject to certain specific legacies, such of his estate as had not previously vested in the daughter under the will to certain societies or bodies as tenants in common to be equally divided between them—*nominatim.* The estate given was in aggregate, to be shared between them individually. The share of the society or body incapable of taking does not enure to the benefit of the others, if any, entitled to take. *Page* v. *Page*, 2 P. Wms., 489; *Bagwell* v. *Dry.*, 1 id., 700. This intent of the testator having failed, by reason of the illegal devises and bequests to these societies, or some of them, that portion of the testator's estate as to which the disposition fails, for such reason, or by reason of any of the contingent trusts being void as within the prohibition against perpetuities, passed on the death of the testator, *eo instanti*, to his heir at law and next of kin. Such must be the devolution of the property, or else the trustees became the indefeasible owners in fee of the real, and absolutely entitled to the personal, estate of the testator not efficiently disposed of by the will. It could not remain in abeyance. The trusts attempted to be created by the will.

*pro tanto* fail. The gift in remainder on the termination of the life estate is inoperative, the heir is not cut off, but comes in by descent to the real estate, and by succession to the personalty, as so much of his ancestor's estate undisposed of. The fact that the beneficiary for life and the heir at law are the same person cannot prevent such result. There was certainly to be a time when the trust was to terminate. At the death of the daughter the trustees became *functi officio* as to that portion of the contingent gift which could not prevail. As to that the trust then terminated, and it passed where it would have passed had no trust been created. If the purposes for which the trust was created did not embrace the entire estate, or if for any reason they were illegal and could not be executed as to a portion of the estate, such portion as is not embraced or is not covered by a legal purpose descends to the heir. If these societies could have taken at all, their right to take the remainder existed at the death of the testator. The effect is the same as though, without the intervention of a trustee, the testator had devised and bequeathed to his daughter for life, with remainder over to a person not in existence, or incompetent to take.

The heirs at law and next of kin of Frances Howard Bostwick succeed directly to the real and personal property owned by her at the time of her death. These respondents are such heirs at law and next of kin.

*J. W. Edmunds, Cook* and *Campbell,* for the American and Foreign Christian Union.

*G. N. Titus* and *T. Westervelt,* for the American Tract Society, the American Colonization Society, the Trustees of the Board of Domestic Missions, and the Board of Foreign Missions.

*A. L. Edwards* and *S. E. Baldwin,* for the Southern Aid Society.

FOSTER, J. This bill is brought by the executors and trustees appointed by the last will and testament of the late

William Bostwick, to procure a construction of that instrument, and to remove certain doubts which it is alleged have arisen as to the validity and effect of some of its provisions. The will bears date May 23, 1860, and there are two codicils annexed to it, one dated April 1, 1861, the other August 16, 1862.   The testator died on the 16th of April, 1863, and the will was admitted to probate in the district of New Haven on the 9th of June, 1863.

Some of the questions suggested for our decision involve little or no difficulty ; indeed there are very few about which we have entertained serious doubts.   On one, the gift to the Southern Aid Society, we have held varying opinions, and are scarcely able, even now, to determine it with unanimity and to our own entire satisfaction.

The testator, Mr. Bostwick, at the time of his death and for some time previous thereto, had his domicil at New Haven. He was a widower, and left no parents, no brother or sister, no descendants of any brother or sister, and but one child, a daughter about fifteen years of age at the time of his death. The will is very carefully, though not very concisely, drawn ; every probable, almost every possible, contingency which could affect the disposition of the property made by it seems to have been anticipated, and every such contingency specifically provided for.   There was evidently much painstaking on the part of the testator to dispose by his will of all and whatsoever property he might die possessed of, and to leave nothing on which, in any possible event, our statute of distributions should operate as intestate estate.   It is plainly our duty so to construe this will as to effect this purpose, if we can do so without contravening well established principles of law.   And we shall give to those rules of construction which aid us in getting at the intent of the testator, and the authorities which sanction the carrying out of that intent, far more consideration than to the wisest maxims or the weightiest precedents which seem to determine that intent by their own inherent power. The application of such maxims and precedents to last wills produces, not unfrequently, results which were never in the mind of the testator.

In the early clauses of this will, and before proceeding to dispose of the bulk of his estate, the testator makes a number of specific bequests to certain members of his household, and to various benevolent and religious societies, amounting in the aggregate to some $10,000. These, excepting two legacies subsequently revoked by a codicil and the gift of $1000 to the Southern Aid Society, have been paid by the executors; no question as to the propriety of such payments being now or having been at any time made. All the rest, residue and remainder of his estate both real and personal, of every kind and description, the testator then gives to Henry White, John P. Crosby and Pelatiah Perit, and the survivors and survivor of them, as joint tenants in fee simple, as a fund, upon the trusts and for the purposes which he then proceeds to specify. The appointment of Mr. Perit was subsequently revoked, and Joseph Sampson substituted in his place. He declined to act, thus leaving Messrs. White and Crosby sole trustees, as well as sole executors. Under this trust his daughter seems to have been the principal object of the testator's bounty. The trustees were to pay to her guardian during her minority so much of the income of the estate as should be necessary and proper for her support, maintenance and education; and after she attained her majority to pay her the whole of said income, during her natural life, if she desired it. The event of her death was foreseen, and specifically provided for in four several contingencies. First, should she die and leave a husband and children surviving her; second, should she leave a husband surviving her, but no children; third, should she leave children, but no husband surviving her; fourth, should she leave neither husband nor children surviving her. This last contingency has actually occurred. The daughter died on the 30th of August, 1865, leaving neither husband nor children, having never been married. The real question therefore is, can the provisions of this will made dependent upon this contingency be carried into effect?

It is obviously unnecessary to decide or consider any of the questions dependent upon other contingencies which have not arisen. We deem it proper to remark however in this connec-

tion, without deciding whether the provisions of the will dependent on other contingencies, such as the accumulation of the estate, the power of appointment given to the daughter to direct to whom, and in what portions, at what times, and in what estates, a portion of the residuum should be given and paid, be valid or not, that the will is not made void, even if those provisions are invalid. In contemplation of a state of facts and circumstances which now actually exist, the testator directs that the whole of said trust fund or property shall be disposed of as follows: $2,000 to the New Haven Orphan Asylum; $5,000 to the American Sunday School Union in Philadelphia; $5,000 to the Society for the Promotion of Collegiate and Theological Education at the West; $10,000 to the American Bible Society in New York; and the residue of said trust fund or property to be divided equally between the following six Societies: the American Tract Society in New York; the Southern Aid Society; the American and Foreign Christian Union Society; the American Colonization Society; the Trustees of the Board of Domestic Missions of the General Assembly of the Presbyterian Church in the United States of America; and the Board of Foreign Missions of the Presbyterian Church in the United States of America. If these bequests are legal and valid, and are carried specifically into effect, all questions arising under this will are necessarily disposed of, for the whole estate will then have been distributed. We proceed therefore to consider these several clauses.

As to the four societies named above to whom specific pecuniary legacies amounting to $22,000 are given, no question seems to have arisen. They are not made parties to the bill, and do not appear in the case. We suppose no objection is made to their receiving severally the sums bequeathed to them.

Of the six societies to which the residue of said trust property is given, five of them, all but the Southern Aid Society, were incorporated at and before the time of the testator's death. The Southern Aid Society was not then incorporated, but became so in October, 1866. As to these five incorpo-

rated societies, we are of opinion that they take respectively each one sixth part of the residuary portion of this estate.

Three of these societies, the American Tract Society, the Board of Foreign Missions of the Presbyterian Church, and the American and Foreign Christian Union Society, were incorporated by the state of New York. The American Colonization Society was incorporated by the state of Maryland, and the Board of Domestic Missions of the Presbyterian Church, by the state of Pennsylvania. The Board of Foreign Missions of the Presbyterian Church, the American Colonization Society, and the Board of Domestic Missions of the Presbyterian Church, are expressly authorized by their charters of incorporation to take by devise. No doubts are expressed that the gifts to these corporations are good and valid.

As the American and Foreign Christian Union Society was incorporated under and in pursuance of the provisions and requirements of the act of the legislature of the state of New York passed April 12, 1848, and the acts amendatory thereof, it is claimed that that society is incapable of taking more than one-fourth of one-sixth of the testator's estate. The law referred to provides that no person leaving a wife, or child, or parent, shall devise or bequeath to such institution or corporation, (meaning any benevolent, charitable, scientific, or missionary society,) more than one-fourth of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of one-fourth. The testator left a daughter, but this devise or bequest was given to take effect only in the event of her death without issue. That event having happened, we perceive no restraint upon the power of this society to take the specified one-sixth of the residuary estate. The object of this law, which was doubtless intended to protect parents, wives and children to a certain extent, is not in the slightest degree frustrated by giving full effect to this provision of the will. The Supreme Court of New York, having recently had this precise question before them in this very case, decided that this society was entitled to one-sixth of the residuary estate situated in New York, and the Court of Appeals affirmed that decision. Be-

sides, we do not regard this law as a part of the charter of the corporation, but only as a statute of that state restraining the right of corporations to take by devise within but not without the state. We treat this question more fully in considering the claim of the Tract Society.

The American Tract Society and the Southern Aid Society are the only societies now remaining of the six to which the residuary estate was given, whose rights under this will remain to be considered. It is asserted that the American Tract Society can take neither real or personal property under this will. That it cannot take real, because its charter of incorporation, granted by the state of New York, does not confer the power of taking by devise; that it cannot take personal, because the charter provides that the net income of said society arising from real and personal estate shall not exceed the sum of $10,000 annually. This limit it is claimed has been reached and exceeded, and so the capacity of the society to take property is exhausted. This society was incorporated by a special act of the legislature of the state of New York, passed May 26, 1841. The third section of its charter provides that the corporation shall possess the general powers, and be subject to the provisions, contained in title 3d of chapter 18 of the first part of the revised statutes, so far as the same are applicable and have not been repealed. The title and chapter referred to enumerate the powers of corporations, and the clause which bears directly upon this subject reads thus: " to hold, purchase, and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter." This charter was amended by the legislature of New York on the 31st of March, 1866, but as this was after the death both of the testator and of his daughter, that amendment need not be particularly considered, as it cannot materially affect the question involved. Now it is manifest that this corporation has express power by its charter to hold, purchase and convey real and personal estate, for specified purposes and to a limited amount. There is no express power to take by devise, nor is the power so to

take expressly prohibited. We suppose there could be no doubt that this corporation could take by devise in New York, if the Statute of Wills of that state empowered corporations generally to take in that manner. The English Statute of Wills, passed in the time of Henry VIII, authorized every person having a sole estate in fee simple of any manors &c., " to give, dispose, will, or devise, to any person or persons, except to bodies politic and corporate, by his last will and testament in writing, or otherwise by any acts lawfully executed in his lifetime, all his manors &c., at his own will and pleasure, any law, statute, custom, or other thing theretofore had, made, or used to the contrary notwithstanding." Thus corporations, by express exception in these statutes, were not enabled to take lands directly by devise in England, and the Statute of Wills of the state of New York makes the same exception. By that statute it is enacted, that all persons, except idiots, persons of unsound mind, married women, and infants, may devise their real estate by a last will and testament duly executed &c. " Such devise may be made to every person capable by law of holding real estate; but no devise to a corporation shall be valid, unless such corporation be expressly authorized by its charter, or by statute, to take by devise." 3 N. Y. Rev. Stat., 138, (5th ed). This corporation therefore, prior to the recent amendment of its charter, could not take by devise in New York, and such is the decision of their Supreme Court and Court of Appeals in this very case. And so it is earnestly contended that it cannot take by devise in Connecticut. We yield readily to the doctrine laid down in this connection in regard to corporations; indeed it is too thoroughly established to be doubted or questioned. That doctrine perhaps is no where better stated than in the case of *Head* v. *Providence Ins. Co.*, 2 Cranch, 127, by the then illustrious head of the Supreme Court of the United States, the late Chief Justice MARSHALL. " It [a corporation] may correctly be said to be precisely what the incorporating act has made it; to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes." Now

this corporation stands at the bar of this court claiming the right to take lands within our territory by devise. It is clothed with such powers as have been conferred by its charter. Those, a portion of them, as we have seen, are to hold, purchase, and convey real estate. It is not expressly authorized to take by devise, nor is it prohibited from so taking. Can it then take by devise? Not in New York, as we have seen. Therefore not in Connecticut, say the counsel for the heirs at law, for being a New York corporation, and by the law of that state devoid of power to take by devise, no argument is needed to show its inability to take by devise in Connecticut. This conclusion is too hastily drawn. If the inability to take by devise arose out of a prohibitory clause in the charter, the conclusion would be legal and logical. But the inability does not so arise. There is no prohibition in the charter; the inability is created by the New York Statute of Wills, expressly excepting corporations from taking by devise. Now this corporation brings with it from New York its charter, but it does not bring with it the New York Statute of Wills and cannot bring it to be recognized as law within this jurisdiction. There is an obvious distinction between an incapacity to take created by the statute of a state, which is local, and a prohibitory clause in the charter, which everywhere cleaves to the corporation. The reasoning is fallacious, not recognizing this distinction. There being no prohibition in the charter, and the power to hold and convey real estate being expressly given, we must look to our own statutes and laws, and not to those of New York, to determine whether or not this corporation can take by devise in Connecticut.

The state of New York has partially adopted the policy of England in regard to devises to corporations, though the English statutes, usually called the statutes of mortmain, have not been reenacted in that state. Those statutes began with *Magna Charta*, in 9 Henry III, and embrace a succession of acts down to and including 9 George II. They were intended to check the ecclesiastics of the Roman church from absorbing in perpetuity, in dead clutch, all the lands of the kingdom, and so withdrawing them from public and feudal

charges.  Shelford on Mortmain, 2.    By the statute of 43
Eliz., ch. 4, known as the Statute of Charitable Uses, lands
may be devised to a corporation for a charitable use, and the
court of chancery will support and enforce such devises.
Whether a court of equity has power to execute and enforce
such trusts, as charities, independent of any statute, is a ques-
tion which has been much discussed, and very high authorities
can be quoted both in favor and against the exercise of such
a power.  We think the later and better opinion to be in favor
of an original and necessary jurisdiction in courts of equity
as to devises in trust for charitable purposes, when the gen-
eral object is sufficiently certain, and not contrary to any pos-
itive rule of law.    It is unnecessary however to decide this
question, for in this state we have no statutes of mortmain; no
exception in our Statute of Wills prohibiting corporations from
taking by devise; aliens, resident in this state or in any of the
United States, may purchase, hold, inherit, or transmit real
estate, in as full and ample a manner as native born citizens;
their wives are entitled to dower; their children and other
lineal descendants may inherit; and we have besides a statute,
passed in our colonial days in 1702, in effect reënacting the
statute of 43 Elizabeth, and containing indeed more liberal and
comprehensive provisions to sustain devises of this description
than are contained in the 43 Elizabeth.    That act provides, that
" all lands, tenements, or other estates, that have been or shall
be given or granted by the General Assembly, or any town or
particular person, for the maintenance of the ministry of the
gospel, or of schools of learning, or for the relief of the poor,
or for any other public and charitable use, shall forever remain
to the uses to which they have been or shall be given or
granted, according to the true intent and meaning of the
grantor, and to no other use whatever."
    We therefore entertain no doubt that the American Tract
Society can take by devise in this state.  As to the other objec-
tion, that having an income greater in amount than is allowed
by its charter it has exhausted its power to take, it suffices to
say that no such fact is found by the very competent com-
mittee whose report is on the record.  A limitation on the

net income from the real and personal estate is not a limitation on a bequest or devise; and we are not satisfied that this inquiry can be legitimately made collaterally in a proceeding of this sort. Nor do we assent to the claim that the burden is on the society to show its capacity to take in this respect. In *Ex Parte Pennsylvania Iron Co.*, 7 Cow., 540, it was held, that where the restraint on the right of purchase was imposed by the charter in a proviso, it was incumbent on the party objecting to the purchase to bring the case by proof within the proviso.

But supposing that this organization as a corporation has exhausted its capacity to take, has forfeited its charter, or that by its charter it never had power to take by devise, still it would under any of these circumstances be entitled to the rights and privileges of a voluntary association of individuals. The treasurer of the organization is well known, his name is given in the report of facts, he has for many years acted uninterruptedly in that capacity, and is still so acting. Now under this will we think he may take as trustee in trust for this association, if it is unable to take as a corporation, having exhausted its capacity to take, or if as a corporation it never had capacity to take by devise. Such is the clear and positive direction of this testator in the 13th article of this will.

The claims of the Southern Aid Society alone remain to be considered. It appears from the finding that this society was formed by a charitable association of individuals in September, 1853, for the purpose of diffusing gospel truth in the southern and south-western states, by the agency of ecclesiastical organizations there existing. They adopted a written constitution for their government; they had an office in New York city, held annual meetings, elected the officers required by their constitution, and the operations of the society were actively and regularly carried on from its formation in 1853, until they were interfered with by the breaking out of hostilities in the spring of 1861. On the 23d of April of that year the executive committee of the society held a meeting in New York city, at which they passed certain resolutions prefixed by a preamble. The preamble sets forth that the unfriendly

relations existing between the north and the south would necessarily embarrass the action of the society in its work of relieving the necessities of missions and missionaries who were dispensing the gospel in the southern portion of our land. They resolved therefore, among other things, that "we now deem it advisable to suspend its operations, and do hereby suspend them, until our civil commotions shall cease, or until in some other way the indications of Providence shall beckon us forward." Active operations of the society ceased substantially from this time, and no meeting was held until the 11th of October, 1865. That meeting was called by a circular dated September 20th, 1865, signed by a number of the officers and members of the society who composed the executive committee. The call stated that it had become a practical question whether the society ought not to resume operations, and the object of the meeting was to consider the expediency of reorganization, and such other purposes as might be deemed proper and suitable for the occasion. At the meeting on the 11th of October, 1865, a statement of the financial condition of the society was made by the treasurer, Gerard Hallock, Esq., from which it appeared that the amount of money received between the date of the last annual meeting, November 26, 1860, and the suspension of the society's operations by reason of the war, had been expended, and that the society was out of funds and out of debt. As the constitution required the officers of the society to be elected at the annual meeting, and as the time for that meeting was fixed for the last Monday in November, the committee was directed to convoke the annual meeting at that time. On the 27th of November, 1865, the last Monday in the month, the meeting was held, and the proper officers of the society duly chosen. Lucius Hopkins, Esq. was chosen treasurer, in place of Gerard Hallock, Esq., resigned. Meetings of the association continued to be held thereafter from time to time, and in October, 1866, by complying with the requirements of the statute law of the state of New York of April 12, 1848, said association became incorporated. Lucius Hopkins has continued to be since November, 1865, and now is, the treasurer of said society.

Was this association dissolved, dead, as an organization, in consequence of the action of the executive committee above stated in the spring of 1861, and the subsequent suspension of active operations from that time till the autumn of 1865 ? We have entertained doubts on this question, and they are not entirely removed, but we have on the whole come to the conclusion that the society was not dissolved; it was not dead from and after the spring of 1861. 'All its active operations in the southern portion of our country, its chosen field of labor, were necessarily suspended, for there could be no lawful intercourse between the northern and southern sections of our Union. A flagrant civil war was raging. The vote looking towards a dissolution, if any vote has that aspect, was not the vote of the society, but only of the executive committee. The power of that committee to dissolve the society may well be questioned; no such power was granted them in the constitution, nor did the society contemplate the exercise of any such power at the time of their appointment. The language of the resolution passed by them, fairly interpreted, though it contemplates a suspension of operations, clearly an imperative necessity, does not look towards a dissolution of the society. It directs a suspension "until our civil commotions shall cease, or until in some other way the indications of Providence shall beckon us forward." The Supreme Court of New York in trying this case found that this society continued in existence, and the Court of Appeals, by GROVER, J., says, "that finding is conclusive upon this court." We should not say that this finding is conclusive upon this tribunal, but in view of the fact that the report of the committee in the Superior Court does not pass upon this question, the finding of the court in New York is entitled to great weight. The committee does find that the society had disposed of its funds and ceased from active operations before January 8th, 1862, and from the facts above stated it appears that Mr. Hallock made his report as treasurer at the meeting of the society in November, 1865. We think it reasonably clear that the testator considered this society in existence in August, 1862, when he made a codicil to his will. Had he not so considered it, it is

scarcely to be supposed that he would not have made a change in his will. It is quite true that his opinion upon the subject could not control the fact, but it is valuable as an item of evidence, going to show that the society, though its action was suspended, was still regarded by its members and an earnest and munificent friend, as living, not dead.

But if this association had been dissolved, and were now out of existence, dead, there would still remain this bequest and devise to be disposed of. The gift was not to the society for their benefit at all. The society was the trustee, not the *cestui que trust*—the instrumentality, not the beneficiary. The objects of the testator's bounty are still living, and will live as long as human beings require moral and religious training, and their necessities were never greater or more pressing than now. This is a charity which a court of equity is bound to uphold if practicable. The only difficulty is whether the trust is sufficiently certain and definite to be executed by the court. We look into the constitution of the Southern Aid Society, and find the purpose to be "the diffusion of gospel truth in the southern and south-western states, to be accomplished under the direction of ecclesiastical bodies, or missionary organizations of an evangelical character, existing within said states." It is unfortunately true that there is a wide difference between the many christian sects and denominations of our time as to what constitutes "gospel truth;" its teachers do not yet see eye to eye, and as we happily have no state religion, it might embarrass the court to appoint a trustee who would be called on to decide the question. Says DAGGETT, J., in giving the opinion of the court in *Bull* v. *Bull*, 8 Conn., 51, "if it [the devise] can by possibility be upheld, then it never can be pronounced void for uncertainty." After all, this is no more uncertain than our own statute of 1702 which we have quoted above; "for the maintenance of the ministry of the gospel" is one of the clauses of that statute. If this devise is void because of the uncertainty of the term "gospel truth," we think this provision of the statute must be void for the same reason. We should hesitate to pronounce a decision

declaring one of the clauses in this ancient statute void for uncertainty.

But we are relieved from any difficulty as to the uncertainty of this devise, by the fact found by the committee that in October, 1866, said association was duly incorporated under the name of the Southern Aid Society, and that Lucius Hopkins, since November, 1865, has been and now is treasurer of said society. There is no difficulty in paying over to him this bequest, and in conveying to him the sixth part of the residuum of this estate according to the provisions of this will. He is in effect the trustee designated by the testator.

No difficulty arises in this case on account of the descent of the fee of this estate to the heirs at law. On the death of the testator the legal title was vested in the trustees by the express terms of the will. That title was not divested by the death of the daughter, nor by any subsequent event. It is not in abeyance, a legal term not remarkable for any definite idea conveyed by it, even when aided by the phrases *in gremio legis*, or *in nubibus*, which are frequently added by way of explanation. The legal title is still in the trustees, and the money legacies payable to the four societies, amounting to $22,000, and the legacy to the Southern Aid Society, amounting to $1,000, being paid, the trustees will then transfer and convey the residuum of the estate to the six societies named in the seventh article of said will, one-sixth to each; the payments and conveyances to be made to the respective treasurers of said societies.

In arriving at this result we feel confident that we carry out the intent of the testator, and we are not aware that in doing so we have violated any established rule of law. It was long since remarked by a distinguished judge in England, that men's deeds and wills, by which they settle their estates, are the laws that private men are allowed to make, and they are not to be altered even by the king in his courts of law or conscience. The first clause in our statute on this subject is, " All persons of the age of twenty-one years and of sound mind may dispose of their real estate by will." We must carry into full and complete effect the intention of the testa-

tor, in order to give effect to this statute. This we think we have done, and we have applied the rules of construction recognized and acted upon in this court and elsewhere. We refer to a few cases only, and those in our own state. *Bull v. Bull*, 8 Conn., 47; *American Bible Society* v. *Wetmore*, 17 id., 181; *Treat's Appeal*, 30 id., 113.

The Superior Court is advised to pass a decree in this case in conformity with the rules here laid down.

In this opinion the other judges concurred.