No. 12,998.

## McCANN *v.* THE FIRST NATIONAL BANK OF JEFFERSONVILLE.

NATIONAL BANKS.— *Impairment of Capital.*— *Reduction of Capital Stock to Avoid Assessment.*— *Suspended Claims.*— *Subsequent Collection.*— *Right of Stockholder to Compel Distribution of Assets.*—Where the stockholders in a national banking association, the capital of which has become impaired by reason of past due and suspended claims, to avoid a threatened assessment by the comptroller upon the stock to make good the deficiency, lawfully reduce the capital stock in an amount equal thereto, a stockholder can not, in case the suspended claims are subsequently realized upon and carried into the account as assets, compel the bank to distribute a share of the money so realized in proportion to the amount of stock surrendered by him.

From the Clark Circuit Court.

*J. G. Howard, J. F. Read, M. Z. Stannard* and *A. Dowling,* for appellant.

*J. K. Marsh* and *Brown, Humphrey & Davis,* for appellee.

MITCHELL, C. J.—The First National Bank of Jeffersonville was organized some time prior to the 17th day of August, 1876, in pursuance of the act of Congress which provides for the organization, and prescribes rules for the regulation and government, of national banking associations. The bank had, at the date mentioned, a paid up capital of $300,000, of which Michael V. McCann owned seventy-seven shares of one hundred dollars each.

Owing to the fact that there were among its assets about $71,000 of bills and notes of the Ohio Falls Car and Locomotive Company, on which the interest had remained past due and unpaid for more than six months, and which were not well secured, and in process of collection, the capital of the bank had become impaired, and the comptroller of the currency had given notice, and was about to assess the stock to the amount of $75,000 in order to make good the deficiency,.

according to the requirements of U. S. Rev. Stat., section 5205. The stockholders thereupon, on due consideration, resolved to avail themselves of the privilege conferred by U. S. Rev. Stat., sections 5143 and 5204, in pursuance of which, by the required vote, they reduced the capital stock of the bank from $300,000 to $225,000. There being at that time little or no prospect that the bills and notes of the car and locomotive company would ever become collectible, they were presumably carried to the account of suspended or "bad debts," and were not thereafter included in the reports made to the comptroller as assets of the bank, although they were retained in its custody.

Some time in the year 1882 the bank realized about $75,000 from certain collaterals which had been pledged as security for the bills and notes hereinabove mentioned. This sum was carried into the account and treated as assets of the bank.

McCann, after having, with the other stockholders of the bank, surrendered an amount of his stock proportioned to the reduction made in 1876, commenced suit in May, 1885, for the purpose of compelling the bank to distribute to him a share of the $75,000 realized as above, proportioned to the amount of stock surrendered.

The question is, whether, upon the facts stated, the bank can be compelled, at the suit of a shareholder, to distribute the money realized from the collection of the suspended bills and notes.

An examination of the act of Congress makes it clear that a national banking association may, within limits, reduce its capital stock. This is provided for in express terms by section 5143, which enacts generally that shareholders owning two-thirds of the stock may reduce the capital stock of the bank to any amount not less than the minimum required by the act, nor than the amount required for the outstanding circulation of the bank, upon the approval of the comptroller. Section 5204, after providing that "No association, or any

member thereof, shall, during the time it shall continue its banking operations, withdraw, or permit to be withdrawn, either in the form of dividends or otherwise, any portion of its capital," and after prohibiting the making of dividends, in case losses have been sustained which exceed the undivided net profits then on hand, deducting from such profits its losses and bad debts, as bad debts are therein defined, concludes as follows: " But nothing in this section shall prevent the reduction of the capital stock of the association under section 5143."

Section 5205 makes provision for enforcing payment of the capital stock, in case the capital has not been paid in, and also provides for assessments upon the shareholders to make good any deficiency, in case the capital stock becomes impaired by losses or otherwise, and makes provision for forcing the association into liquidation in the event of failure to pay in the capital stock, or in case the shareholders neglect or refuse to pay up assessments which have been made in order to make good deficiencies which may have resulted from losses or otherwise.

It becomes apparent, upon looking into the act of Congress under which national banking associations are organized, and which regulates the conduct of their business, that shareholders owning the requisite amount of stock in such an association may reduce the amount of the capital, voluntarily, for the purpose, as it were, of producing a surplus for withdrawal and distribution, or they may be constrained to a reduction of the capital, rather than submit to assessments upon their stock so as to make good deficiencies occasioned by losses or otherwise. The intent and purpose of the act plainly is, that in no contingency shall the amount of the capital stock exceed its actual value, taking into account the live assets and condition of the bank. In other words, the amount of the capital must be " in line " with its value, and this uniformity may be secured either by a reduction of the amount to any point not below the minimum required, or

by assessing the stock, in case of loss or impairment, so as to make the actual value correspond uniformly with the amount of the capital stock.

The case under consideration proceeds upon the theory that the stockholders became the owners of the bills and notes the suspension of which occasioned the reduction of the capital, because they surrendered an amount of their stock sufficient to restore the equilibrium, so to speak, between the amount and value of the capital of the bank. It is assumed that if the shareholders had reduced their capital without constraint, for the purpose merely of withdrawing the excess of capital above the amount to which it was reduced, the excess would necessarily have been distributable among the shareholders. It is from this premise that the conclusion is drawn that the bank became liable to distribute the $75,000 collected in the manner hereinabove stated. In support of this conclusion *Seeley* v. *New York Nat'l Exchange Bank*, 8 Daly, 400 (Thompson Nat'l Bank Cases, 804), is cited. That was a case in which stockholders of a bank, representing two-thirds of its stock, reduced the capital of the bank, with the approval of the comptroller, from $500,000 to $300,000. The directors resolved to distribute $100,000 among the stockholders, and to retain $100,000 as a surplus fund to be used in the business of the bank. One of the stockholders, who refused to surrender any part of his stock, commenced suit, and the court held that the bank was bound to pay the whole of the $200,000, which resulted from the reduction, to the stockholders. Stress seemed to be laid upon the fact that it appeared in that case that there had been no impairment of the capital of the bank. The reduction was assimilated to the winding up of the bank *pro tanto.*

There is certainly no express provision in the law authorizing the withdrawal and distribution of any part of the capital stock of a banking association prior to the final winding up of the bank. On the contrary, as has already been

seen, section 5204, in terms, prohibits any association, or member thereof, from withdrawing, or permitting to be withdrawn, any portion of its capital stock during the time the bank continues its banking operations.    Notwithstanding this prohibition, it may well be, in case a banking association should find itself unable to employ the whole of the capital originally embarked in the enterprise, and should for that reason determine upon and actually effect an authorized reduction, that the excess would in that event be liberated and cease thereafter to be part of its capital stock.

In such a case the excess could well be said to have accomplished its mission as bank capital, and, like a dividend duly declared, could not be carried to the surplus fund of the bank, and be diverted from the stockholders, without their consent.    Having reduced its capital upon the sole pretext that it could not find employment for the excess, the bank would not, for obvious reasons, be heard to say, after the reduction had been allowed and made, that it would retain the money for use in its business.    Such a reduction would proceed upon the implied understanding that the stockholders should have, as a consideration for the surrender of a portion of their stock, a *pro rata* distribution of the excess.    To refuse to distribute the excess above what was required to maintain the reduced stock at its full value would, in such a case, be in the nature of a fraud upon the stockholders.    " But it is not the rule that the reduction of the capital stock of a corporation always authorizes the distribution among the stockholders of a sum equal to the difference between the original and the reduced amount of capital.    Such a distribution is lawful only when it appears that the original capital stock is unimpaired."    Cook Stock and Stockholders, sections 289, 537.

In the present case the reduction was not made to effect a distribution of a portion of the accumulated surplus or unemployed capital of the bank.    The original capital had become impaired by reason of " bad debts," and the stock-

holders were in the situation of being compelled to elect, either to submit to an assessment of their stock, or go into liquidation, or reduce the capital of the bank so as to put the amount of the capital in correspondence with its value. They chose the latter alternative. Rather than submit to an assessment of their stock, so as to make good the deficiency, each stockholder surrendered a proportionate share of his stock, and by that means they secured the privilege of continuing the business of the bank with a reduced capital.

The appellant, as appears from his complaint, surrendered his proportion, receiving as a consideration therefor immunity from the impending assessment, and the privilege of holding the residue of his stock in a continuing association. This was all the consideration he contemplated, and all that was implied in the transaction. *Delano* v. *Butler*, 118 U. S. 634.

Having received the whole consideration upon which the surrender was made, the stockholders could not afterwards recover more, simply because the bank succeeded in realizing upon the suspended bills and notes, the suspension of which occasioned the reduction.

If the stockholders had submitted to the proposed assessment of their stock, and paid in the $75,000 instead of reducing the capital stock, it would hardly be claimed that they would have become entitled to take or receive from the bank an equal amount of its suspended assets; nor can we perceive any reason why they should have become entitled to them because they elected to reduce the capital stock.

Corporations have no implied power to enlarge or diminish their capital, or to distribute among shareholders any part of the fund which constitutes capital stock, prior to the winding up of the corporation. *Sutherland* v. *Olcott*, 95 N. Y. 93.

Persons who invest moneyed capital in national banking associations must look to the act of Congress, to which such associations owe their existence, and which regulates their

conduct, for authority to demand the return to them of any part of the capital invested, or to receive gains in the shape of dividends therefrom.    Section 5143, under which the reduction was authorized, required the bank to obtain the approval of the comptroller of the currency to the proposed reduction of its capital, and the proceedings for diminishing its capital stock ended with the approval so obtained.    The capital of the bank as reduced, and the assets then held by the association, constituted a trust fund, upon the faith of which it was authorized to proceed with its business.

The directors of the bank had no authority thereafter to permit its capital stock or assets to be further depleted by distributions, in one way or the other, of bills and notes among its shareholders.    *In re Exchange Banking Co.*, L. R. 21 Chan. Div. 519.

The bank held its suspended bills under the same authority, and charged with like obligations in respect thereto, as measured its rights and duties in respect to other assets.    It could only distribute its surplus in money when it accumulated in the course of its business, and its right to distribute would depend upon an examination into the condition and affairs of the bank at that time.    *Strong* v. *Brooklyn Cross-Town R. R. Co.*, 93 N. Y. 426.

The rights of the shareholders to compel a distribution, growing out of the reduction, were fixed by the condition of the bank as it existed when the reduction was made, and are not to be determined in the light of subsequent events.

If a distribution had been authorized and made in good faith, it is settled that the stockholders could not have been compelled to refund because of subsequent losses, even though the losses were caused by the suspension of bills and notes held by the bank at the time the distribution was made. *Main* v. *Mills*, 6 Biss. 98 ; *Reid* v. *Eatonton Mfg. Co.*, 40 Ga. 98.

For the same reason, the bank can not now be compelled to distribute because of subsequent events.

Upon any view of the case, the ruling of the learned judge at the circuit was right.

Judgment affirmed, with costs.

HOWK, J., did not participate in the decision of this case.

Filed Nov. 29, 1887.