CHARLES P. COGSWELL *vs.* THE SECOND NATIONAL BANK.

Second Judicial District, Norwich, April Term, 1905.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

A dividend declared by the directors of a corporation in favor of those who are then its stockholders, though payable at a future date, severs the fund to be so distributed from the assets of the corporation. The share of each of the payees so named thereupon vests in him as an individual, and he does not lose it on ceasing to be a shareholder.

A proposed reduction of $100,000 in the capital stock of a national bank was approved by the comptroller of the currency, provided this amount, or so much of it as might be necessary, was first used

to charge off certain bad, doubtful, and unproductive assets, and the balance only paid over to the stockholders. This was agreed to, the reduction was voted by the stockholders, and the bad and doubtful assets were then charged off and set aside by the directors as a trust fund for the benefit of those who were stockholders of record at the date of the comptroller's approval. Subsequently, and upon the expiration of its charter, the affairs of the bank were wound up and the proceeds of this fund, then amounting to over $20,000, became available for distribution. *Held :—*

1. That the action taken by the directors in respect to the charged-off assets was simply one form of declaring a dividend, and therefore the fund and its proceeds belonged, not to the bank or its stockholders at the expiration of its charter, but to those individuals who were stockholders when the fund was severed from the assets of the corporation and set aside for their use and benefit.

2. That their right in this fund was assignable by each of said individuals, with or without a transfer of his shares of stock.

Whether such proceeds would have belonged to those who were stockholders of record at the date of the reduction of the capital stock, had no such action in reference to the charged-off assets been taken by the directors and with the approval of the comptroller, *quære.*

Argued April 27th—decided June 9th, 1905.

APPEALS from an order and decree of the Superior Court in New London County, *Gager, J.,* in receivership proceedings, distributing the cash proceeds of certain assets of a national bank which had been charged off upon a reduction of its capital stock. *Error.*

*Frank T. Brown,* for the appellants (Charles P. Cogswell *et al.*).

*Donald G. Perkins,* with whom was *William H. Shields,* for the appellees (F. S. Jerome *et al.*).

BALDWIN, J. This appeal respects the disposition of the special fund to which reference was made in *Cogswell* v. *Second Nat. Bank,* 76 Conn. 252, 255, 261. It was held in that case that if that fund had been, as alleged, set apart by direction of the comptroller of the currency for the benefit of those who were shareholders of the bank at the time when

its capital was reduced, a valid trust in their favor was thus created.

The facts attending the transaction have now been fully found by the Superior Court.

The directors having voted to recommend a reduction of the capital stock of the bank from $300,000 to $200,000, were advised by the comptroller of the currency that it would be approved " provided so much of the amount as is necessary is used to charge off bad, doubtful and unproductive assets, the difference only being paid to the shareholders in cash," and that " the shareholders of a national bank, upon a reduction in capital stock, are entitled to either receive the cash or the charged-off assets, and neither can be withheld without their consent." The comptroller also said to the president of the bank, in reference to the same matter : " The assets belong to the stockholders of record, and a trust fund must be created, so that those assets may be distributed among the stockholders of record when your capital is reduced." The stockholders then, in May, 1900, voted to make the reduction, without any specification of the mode of accomplishing it; but the president, in asking the approval of this action by the comptroller, filed with him a written statement that " the whole amount of the reduction, viz., $100,000, will be used for the purpose of charging off bad, doubtful and unproductive assets, no money to be paid to the shareholders unless realized from said assets, which are to be set aside and collected for the benefit of the shareholders of record at date of the issuance of the comptroller's certificate approving the reduction." It was understood that this statement was to be replaced by one from the directors ; and on the faith of this understanding a certificate, on June 9th, was given by the comptroller approving the reduction, without any qualifications. The directors subsequently sent him a statement, in conformity with the understanding, dating it back to June 9th. On June 27th a schedule of certain assets of the bank, each item being given a valuation, and the total valuations of all amounting to $100,307.86, was presented to the directors, who there-

upon voted that the assets so scheduled, "which assets are considered either bad or doubtful, and on account of which the capital stock of the bank has been reduced from $300,000 to $200,000, be set aside from the other assets of the bank and be held by it in trust for the stockholders of record on the 9th day of June, 1900, and that whatever may be realized from said assets be distributed from time to time as may be reasonable among said stockholders in proportion to their respective holdings on said date."

Thereupon the account with Capital Stock on the books of the bank was credited with a reduction of $100,000, and the items named in the schedule above described were charged to the account of Profit and Loss at the valuation of $100,307.86. Some of the items were of real estate; the rest were not well secured; and all were those referred to in the directors' statement to the comptroller dated June 9th.

This left the bank with good assets worth over $240,000.

The bank thereafter, until its charter expired in 1903, kept a separate account relating to the assets included in the schedule, entitled "Stockholders Trust," in which were credited all collections and charged all expenditures arising in connection with endeavors to realize upon them.

Two of the scheduled items represented claims for a larger amount; the valuation affixed to each representing the estimated loss upon it. The same claims were also entered in the books of the bank, as part of its remaining capital, at a valuation for each equal to the difference between its face and the valuation assigned to it in the schedule.

The receiver has received $20,240 on account of the scheduled assets. Some of them also remain uncollected, but have a value. To one of the items, entered as "Demand loans, E. A. Packer, $15,647.50," belonged certain railroad stock held as collateral security. A note for over $1,000, made by "C. P. Cogswell, trustee," and discounted by the bank to pay an assessment on this stock, was included in the reduced capital of $200,000, and in March, 1903, was paid off from the proceeds of sales of the stock; leaving a

balance of such proceeds, which was included in the $20,240 above mentioned.

All the certificates representing the shares in the original capital were, on or about July 1st, 1900, exchanged by the holders for certificates in favor of each for two thirds of the number of his original shares.

As a conclusion from all these facts it was found by the trial court that the " reduction of capital stock was made to meet the diminution in the assets of the bank caused by charging off said assets described in said schedule in the manner hereinbefore set forth, and not for the purpose of setting free any capital of the bank," whereupon an order was made that the assets included in the schedule of June 27th, 1900, and their proceeds, belonged to the bank and should be distributed to those who were shareholders at the expiration of its charter.

The subordinate facts which have been detailed do not justify these ultimate conclusions, either of fact or law.

The reduction of capital stock was accomplished before the assets described in the schedule were charged off. It was accomplished by a vote of the shareholders, approved by the comptroller of the currency, and his approval was only secured by the assurance of the president and directors that certain bad, doubtful and unproductive assets would be charged off and set aside for the benefit of those who were shareholders at the date of such approval. It is of no consequence in this proceeding that the certificate of approval did not refer to these assurances. It is enough that it was given because of them. What was thus promised the directors did. They had the right to do it. U. S. Rev. Stat., § 5145. The bank was not being wound up. The directors' vote was simply a form of declaring a dividend from assets in excess of the capital stock. *Smith* v. *Dana*, 77 Conn. 543, 554. The right to receive what might ultimately be realized from the fund thus set apart became therefore irrevocably vested in those who were shareholders on June 9th, 1900, and they or their assigns are now entitled to whatever is to be distributed from it.

Directors of national banks can declare dividends only out of net profits. U. S. Rev. Stat., §§ 5199, 5204. It is contended that the fund set apart in this case did not consist of net profits. Technically this is true. But it was the equivalent of net profits within the meaning of these statutory provisions, which were intended simply to preserve the capital stock intact, and to provide for turning a part of the net profits into a surplus fund, to be accumulated until it equalled twenty per cent. of the capital stock. Such a surplus fund existed in case of the bank whose affairs are being wound up in this proceeding, at the time when the fund now in question was set apart for distribution. Whether if no provision in regard to the assets charged off had been made by the directors and with the approval of the comptroller, in the nature of the declaration of a dividend, whatever might have been thereafter realized from them would have belonged to those then shareholders in the bank, we need not inquire. See *Seeley* v. *New York Nat. Bank*, 8 Daly, 400, 78 N. Y. 608; *Strong* v. *Brooklyn Cross-Town R. Co.*, 93 N. Y. 426; *McCann* v. *First Nat. Bank*, 112 Ind. 354, 14 Northeastern Rep. 251, 131 Ind: 95, 30 Northeastern Rep. 893. With his approval, whatever it was not necessary to retain as capital, or to form a surplus fund, might certainly, with the assent and by vote of the directors, be returned to the shareholders; and if a dividend were ordered then, it might be made payable thereafter, and only on the contingency of future collections.

There was no impropriety in placing in the schedule at a certain valuation claims which were also and primarily retained at another and lesser valuation as part of the capital stock. If a note for $2,000 had been discounted on the faith of collateral security which was certainly worth $500 and might be worth more, there could be no legal objection to charging off $1,500 from the book valuation of the loan and embracing it at a valuation of $1,500 in doubtful assets set aside for the purposes of an ultimate dividend, while also carrying it along at a valuation of $500, as part of the assets representing the capital stock. In such case what

would be really set aside would be not the note, but an interest in any collections on account of it in excess of $500.

Certain of those who were shareholders on June 9th, 1900, have since transferred their shares. Such transfers (notwithstanding U. S. Rev. Stat., § 5139) did not pass the right to any interest in the special trust fund created on that day. A dividend declared by the directors of a corporation in favor of those who are then its shareholders, though payable at a future date, severs the fund to be so distributed from the assets of the corporation. The share of each of the payees so named thereupon vests in him as an individual, and he does not lose it on ceasing to be a shareholder. *Beers* v. *Bridgeport Spring Co.*, 42 Conn. 17, 24; *Second Universalist Church* v. *Colegrove*, 74 id. 79, 84.

It follows also from the same considerations, that those who were shareholders on June 9th, 1900, could at any time thereafter transfer their rights in the special trust fund, whether with or without a transfer of their shares.

There is error and the order appealed from is reversed, with directions to enter an order for a distribution in conformity with this opinion.

In this opinion the other judges concurred.