THE UNION AND NEW HAVEN TRUST COMPANY, TRUSTEE, ET AL., *vs.* GEORGE D. WATROUS, ADMINISTRATOR.

*Third Judicial District, Bridgeport, October Term, 1928.

WHEELER, C. J., MALTBIE, HAINES, HINMAN AND BANKS, Js.

* The supplemental briefs filed on the reargument of this case may be found in the volume for the Third Judicial District, April Term, 1929.

Argued November 1st, 1928, reargued April 10th, 1929—decided June 13th, 1929.

*J. Dwight Dana,* for the appellants (plaintiffs).

*Harrison Hewitt* and *Charles A. Watrous,* for the appellee (defendant).

HAINES, J.   From the stipulated facts it appears that the questions raised by the reservation are involved in the settlement of the estate of Franklin S. Bradley, deceased; that his death occurred April 26th, 1908, leaving a widow Ella C. Bradley and, as his only heirs at law, four children and a granddaughter, the child of a deceased son of the testator. One son of the testator has since died, and the Mechanics Bank of New Haven is now acting as trustee of a life estate created by the will of this deceased son.

In the sixth paragraph of the will of Franklin S. Bradley, among other provisions, he gave, devised and bequeathed to his widow, Ella C. Bradley and John T. Manson, and to the survivor of them, in trust, "all the rest, remainder and residue of my estate . . . to have and to hold the same during the widowhood of my wife, Ella C. Bradley, upon the following trusts, namely, . . . that they will permit my said wife, so long as she remains my widow, to personally use and occupy my said Homestead . . . ; that they will rent for the benefit of my said wife my said Homestead when not occupied by her as aforesaid, and that they will pay over semi-annually to my said wife for her

support so much of the net income of said trust estate as may be needed for that purpose, and if the net income shall not, from any cause, be sufficient, then to expend and use so much of the principal as may be necessary for her comfortable support during the continuance of this trust. . . ." By the seventh paragraph it was provided that upon the death or remarriage of Ella C. Bradley, the surviving trustee should "divide all that then remains of my estate, including my Homestead if it has not been sold, into five equal portions," following which were directions for the subsequent distribution of the remainder estate.

The trustees named duly qualified, but on July 29th, 1910, John T. Manson resigned and George D. Watrous was appointed in his stead and thereafter acted as cotrustee with Ella C. Bradley to the time of her death July 18th, 1926, and is now the defendant administrator of her estate.

Shortly after the death of Franklin S. Bradley, certain questions arose as to the proper interpretation of some portions of paragraphs six, seven and eight of his will, and all the persons interested in his estate thereupon, on July 2d, 1908, entered into an agreement "with reference to the construction of said will and the administration of said estate." By that agreement it was stipulated, among other things, "that the true construction of said will shall be deemed to be in accordance with the terms of this agreement so far as this agreement relates thereto." It was further provided that after certain payments from the net income of the trust estate to various heirs aggregating $5,000 annually, the trustee should pay "the balance of said income from the trust affecting said residue to the said Ella C. Bradley personally, in semi-annual payments."

The will provided that the trustees should pay the

widow "for her support so much of the net income of said trust estate as may be needed for that purpose." Any uncertainty as to the testator's intention in regard to income not needed for her support, was set at rest by the agreement in which all parties in interest united, in holding that intent to be that all the net income above the $5,000 referred to, should be applied to the support of the widow. Whatever we might have held that intent to be were we called upon to construe the will itself, this agreement, upon which all parties now concededly stand, does not permit the remaindermen to question the right of the widow to all the net income above $5,000 annually, during her life. Nor are they permitted to say that any portion of that income was not needed for her support. The net income of the trust estate which vested in the trustees from the date of this agreement to July 1st, 1926,—which was but eighteen days before the death of the widow—was distributed among the beneficiaries in accordance with this agreement. A part of the corpus of the fund in the hands of the trustees consisted of certain stock of the St. Joseph Lead Company and stock of The American Telephone and Telegraph Company. On December 17th, 1925, the board of trustees of the St. Joseph Lead Company, declared certain dividends payable quarterly at later periods, the last two of such quarterly payments to be made "to all stockholders of record at the close of business on September 9, 1926," and "to all stockholders of record at the close of business on December 9, 1926." The board of directors of The American Telephone and Telegraph Company, on May 19th, 1926, declared four quarterly dividends, the last three of which were to be paid "to stockholders of record at the close of business on Monday, September 20, 1926," "to stockholders of record at the close of business on Mon-

day, December 20, 1926" and "to stockholders of record at the close of business on Tuesday, March 15, 1927." While all these dividends were thus declared during the lifetime of the widow, all the dates of payment proved to be subsequent to her death.

This presents the primary question raised in this action, viz: whether the dividends so declared and so payable, belong to the estate of the widow of Ella C. Bradley, or to the remaindermen. The Court of Probate for the district of New Haven, in which the will of Franklin S. Bradley was probated, held these dividends to be the property of the estate of the widow, but upon appeal to the Superior Court, the opposite view was clearly indicated by the sustaining of the demurrer to the reasons of appeal. By reservation, this question is now before us.

Since, as we have seen, the net income over and above $5,000 annually belonged to the widow, and since the $5,000 required payments had been made to within a few days of the termination of the life estate, it is manifest that these dividends belonged to the estate of the widow if, but only if, they were in legal contemplation "income" during her life. The remaindermen contend they only became "income," as distinguished from the corpus of the trust estate, at the times named in the votes for the ascertainment of the names of the stockholders to whom they should be payable, while the administrator of her estate claims that they became and remained "income" from the time they were declared.

The establishment of a trust fund of this character results in the creation of two separate and distinct interests in the property which is the subject of the trust, both interests being held and conserved by the trustee appointed for that purpose and terminating only with the death of the life tenant. Generally

speaking, the principal or corpus of the fund represents the sole interest of the remainderman and the fund which results from the earning power of the principal, when set apart from the principal, represents the interest of the life tenant.

The controlling effect of the agreement in the present case, precludes any claim that the intent of the creator of the trust was to increase the principal fund for the benefit of the remaindermen. They are entitled to receive the fund intact when its earning power has ceased to accrue to the benefit of the life tenant. On the other hand, the life tenant is entitled to receive the full benefit of that earning power, when it becomes fixed and separated from the principal as dividends or interest. *Bishop* v. *Bishop,* 81 Conn. 509, 527, 71 Atl. 583; *Boardman* v. *Mansfield,* 79 Conn. 634, 637, 66 Atl. 169; *Green* v. *Bissell,* 79 Conn. 547, 552, 65 Atl. 1056; *Smith* v. *Dana,* 77 Conn. 543, 548, 60 Atl. 117. Before the separation takes place, the title to corporate earnings is in the corporation itself, but when the proper and legal authority separates the earnings from the corporate assets and fixes the amount and declares them to be the property of the stockholder, their whole character is changed and they then become, for the first time, a definite personal asset of the stockholder. At this moment the beneficial interest in the sum so declared —in a trust of this character—vests in the life tenant. It then becomes, manifestly, a matter of no financial interest to the remainderman because it is a fund separate and distinct from the principal which alone represents his interest. Before a dividend is declared the intangible right of a stockholder to share in the earnings of the corporation is a mere incident to the stock and passes with it on a sale. When a dividend has been declared and a definite portion of the earn-

ings of the corporation separated from the corporate assets, such dividend becomes the property of the owner of the shares of stock; it constitutes a property interest separate from the stock, forms no part of it, and does not pass as an incident to it. *Ford* v. *Snook*, 205 N. Y. App. Div. 194, 196. When by the declaration of a dividend, the share of the stockholder is severed from the corporate fund, it becomes his individual property and thenceforth the company owes him a debt. *Beers* v. *Bridgeport Spring Co.*, 42 Conn. 17, 24. The declaration of a dividend creates a debt against the corporation in favor of each stockholder to the amount due him as his pro rata share. *Bishop* v. *Bishop*, 81 Conn. 509, 528, 17 Atl. 583; *Cogswell* v. *Second National Bank*, 78 Conn. 75, 81, 60 Atl. 1059; *Terry* v. *Eagle Lock Co.*, 47 Conn. 141, 164. "If the declaration of a dividend is fairly and properly made, out of profits existing at the time it is declared, the relation of debtor and creditor is thereby established between the corporation and the stockholder and a debt is thereby created against the corporation and in favor of the stockholder for the amount of the dividend due on the stock held by him." *McLaran* v. *Crescent Planing Mill Co.*, 117 Mo. App. 40, 46, 93 S.W. 819, 821; *Raynolds* v. *Diamond Mills Paper Co.*, 69 N. J. Eq. 299, 300, 60 Atl. 941; *Wallin* v. *Johnson City Lumber & Mfg. Co.*, 136 Tenn. 124, 126, 188 S.W. 577; *Staats* v. *Biograph Co.*, 236 Fed. 454, 458.

Though the general rule is thus well established, the present case presents the question from a somewhat different angle. These dividends were declared on a date prior to the death of the life tenant with the following provision for their payment: "Payable to stockholders of record at the close of business on Monday, September 20, 1926," and other dates which

proved to be subsequent to the death of the life tenant. Under the declarations when did the separation of the amount of the dividend from the corporate assets take place? Did it occur at the time the declaration was made in accordance with the general rule governing dividends payable presently or at a future date, or was the separation postponed to the dates fixed for determining the names of the stockholders to whom the corporation was authorized to pay it?

The answer requires a preliminary consideration of the nature of this act of separation, resulting in the creation of a definite sum for the benefit of the stockholder, and of the authority for the act. Manifestly such an act is beyond the power or the control of any of the stockholders. Nor can it be accomplished or changed by any law of a State outside the State from which the corporate powers are derived. It is strictly a corporate act, and the authority for its exercise is to be found only in the law by which the corporation exists and operates. Since the corporations in question are New York corporations, it follows that the laws of that State are the sole authority for their corporate act of separating a given sum from the corporate assets and setting it apart for the stockholder. This act of separation is one which fundamentally involves the internal policy and management of the corporation. "Such vote relates to a detail touching the internal management of the corporation. It belongs to a class of affairs which the corporation has a right ordinarily to settle and thereby bind its stockholders so long as the action taken is in good faith and without fraud or collusion. . . . Persons by becoming stockholders in a corporation impliedly agree to be bound by the reasonable rules and practices adopted for the management of cor-

porate affairs. . . . It is but the logical result of general principles of corporation law to hold that a vote of that nature passed in good faith and reasonable in its operation is binding upon the stockholders." *Nutter* v. *Andrews,* 246 Mass. 224, 228, 140 N.E. 744. "The rights of a shareholder to participate in the administration of the affairs of the corporation and to participate in the . . . distribution of assets on dissolution and his rights on the issuance of new shares are determined by the law of the State of incorporation." Amer. Law Inst. Tent. Restatement No. 3, Conflict of Laws (May, 1927) § 196. "We find no authority which pretends to limit the power of the board of directors to fix the day when a part of the assets of the corporation shall be separated and vested in its stockholders as individuals." *Richter & Co.* v. *Light,* 97 Conn. 364, 370, 116 Atl. 600. "A citizen of one State who becomes a shareholder in a corporation created under the laws of another, enters into contract relations the extent and obligation of which depend largely upon those laws." *Fish* v. *Smith,* 73 Conn. 377, 380, 47 Atl. 711. "It [a corporation] may correctly be said to be precisely what the incorporating act has made it; to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes." *White* v. *Howard,* 38 Conn. 342, 360 (Quoting Chief Justice Marshall). The indivisible unity between the members of a corporation of this kind, in respect of the fund from which their rights are to be enforced and the consequence that their rights must be determined by a single law, is elaborated in *Supreme Council of the Royal Arcanum* v. *Green,* 237 U. S. 531, 542, 35 Sup. Ct. 724. The act of becoming a member is something more than a contract,—it is entering into a complex and abiding relation—and as marriage

looks to domicil, membership looks to and must be governed by the law of the State granting the incorporation. "We need not consider what other States may refuse to do, but we deem it established that they cannot attach to membership rights against the company that are refused by the law of the domicil." *Modern Woodmen of America* v. *Mixer,* 267 U.S. 544, 551, 45 Sup.Ct. 389. "A citizen of the United States who becomes a stockholder in a foreign corporation holds his stock subject to the laws and policy of the country of the corporation's domicil, and where, by an amendment of its by-laws, the corporation acquires a lien which, under the law of the country, is paramount to the lien of a previous pledgee, the priority of such lien must be recognized by the courts of the United States." *Hudson River Pulp & Paper Co.* v. *Warner & Co.,* 99 Fed. 187 (Syllabus). "The declaration of a dividend from a surplus, or the division of profits is within those discretionary powers of the directors or trustees, which will not be controlled by the courts." *Beveridge* v. *New York Elevated R. Co.,* 112 N.Y. 1, 27, 19 N.E. 489; *Williams* v. *Western Union Telegraph Co.,* 93 N.Y. 162, 192; *Supreme Colony* v. *Towne,* 87 Conn. 644, 647, 89 Atl. 264; *Supreme Lodge, N. E. O. P.* v. *Hine,* 82 Conn. 315, 321, 73 Atl. 791; *Hammond* v. *Hastings,* 134 U.S. 401, 404, 10 Sup. Ct. 727; *Canada Southern Ry. Co.* v. *Gebhard,* 109 U.S. 527, 537, 538, 3 Sup. Ct. 363.

It is clear (1) that when monies are thus severed by the directors from the corporate assets for the benefit of the stockholders, the corporation by that act surrenders its beneficial title to them and they at once become debts due from the corporation to them; (2) that the act of separation is a strictly corporate act involving the internal management and policy of the

corporation, and authorized and controlled exclusively by the law of the corporate domicil.

We now consider when this act of separation took place under the specific terms used in the declaration by these directors. When did the shareholder cease to have only a joint undivided interest in the corporate assets to the extent of his ownership of shares, and become also a creditor of the corporation having an individual claim upon it for the amount of the assets set aside for him by the act of the corporation?

The answer to this question requires us to determine the effect upon the relation of the stockholder to these New York corporations, of the declaration by the directors that the dividends were payable to stockholders of record on given dates in the future. Since we are considering the meaning and effect of this corporate act, the sole authority for which must be found in the laws of New York, it is clear that its interpretation must be sought only at the same source. When these monies were set apart as dividends must be determined by the intent and legal effect of the action of the corporate directors, in making their declaration. *Rand* v. *Hubbell*, 115 Mass. 461, 474; *Leland* v. *Hayden*, 102 Mass. 542, 549, 550; *Lyman* v. *Pratt*, 183 Mass. 58, 61, 66 N.E. 423. What the law of the corporate domicil decrees to be the intent and legal effect, we must accept as conclusive. We cannot control the determination of a foreign dividend nor regulate its terms nor decree its legal effect.

If it be conceded that the law of Connecticut on the authority of *Richter & Co.* v. *Light*, 97 Conn. 364, 116 Atl. 600, or of Massachusetts on the authority of *Nutter* v. *Andrews*, 246 Mass. 224, 140 N.E. 744, would determine that dividends so declared were not intended to be and were not set apart by the directors until the dates of the closing of the stock books, it

does not aid in the solution of our problem, for the obvious reason that we are interpreting the act of the directors of a New York corporation operating under the law of that State and it must be interpreted by that law.

We find no better statement of what that law is than the following: "The provision in a resolution declaring a dividend, relative to its being payable to stockholders of record on a certain day is intended to serve the convenience of the corporation and to protect it in paying to the persons who appear on its books, where it has no notice of transfer. It does not affect the title to the dividend. . . . The declaration of a dividend . . . creates a debt in favor of the latter against the corporation." *Ford* v. *Snook,* 205 N.Y. App. Div. 194, 196. It is urged by counsel for the remaindermen that this decision is merely an *obiter dictum,* but our study of it does not so indicate. On March 18th Snook delivered to a trust company certain stock to be sold at 79. On March 10th a dividend had been declared payable as of April 1st "to holders of stock shown by the books at the close of business March 20th". The stock was sold, but the transfer was not made on the stock books until after March 20th. Snook being still the stockholder of record as of that date the dividend was paid to him and the purchaser brought this action against him for it, alleging that there had been a special agreement at the time of sale that the stock was to carry the dividend to the purchaser. The plaintiff failed to fully prove this allegation but did prove a custom of the New York Stock Exchange that a sale of stock on which a dividend had been declared, carried the dividend and the trial court directed a verdict. The Appellate Division held this to be error, and that assuming the evidence of the Stock Exchange rule was competent

although not in conformity with the complaint, yet (1) it was not available to the plaintiff because there was no proof that the defendant knew of the rule or that the sale was to be made in any particular market and so proof of the rule could not change the contract of sale as made, and (2) that upon the general principles of law the declaration of the dividend created a debt in favor of the then stockholder and it thereupon became his property whether payable immediately or at a future time. It is to be noted that as this defendant did not contract in relation to the Stock Exchange rule the sale was to be governed by the law of the State of New York and not by the rule of the Stock Exchange. The Court of Appeals affirmed this decision without opinion. 240 N.Y. 624, 148 N.E. 732.

In reaching its conclusion the court added: "When a dividend has been declared out of the earnings of a corporation, such dividend becomes the property of the owners of the shares of stock, no matter whether payable immediately or at a future time. . . . The defendant's right to the dividend is, therefore, clear." The court remarked: "I reach the conclusion that the defendant did not clothe the plaintiffs with authority to sell his stock with the 'dividend on' in accordance with a custom and usage [that of the New York Stock Exchange] of which, so far as appears, he had no knowledge. The plaintiffs have sought to change by proof of such custom the intrinsic character of the original contract between the parties. This may not be done." The decision in *Ford* v. *Snook* is in harmony with other decisions in that State, to some of which we now refer. In *Matter of Kernochan* (1887) 104 N.Y. 618, 624, 11 N.E. 149, one Marshall by his will empowered his executors to receive the rents, interest and income of certain of his estate given to

them in trust for that purpose, to apply the net income to the use of the widow during her life and after her death to divide the remaining estate among certain children and their representatives. Included in the trust was five thousand shares of the Panama Railroad Company stock. On April 14th, 1881, a dividend was declared by the railroad company upon this stock payable May 2d, 1881. The testator died April 20th, 1881. It was claimed in behalf of the widow that this dividend belonged to her as life tenant. The court said: "As soon as the profits on shares of stock are ascertained and declared, they cease to be the property of the company, and the owner of the shares becomes entitled to the dividend. It at once forms part of his estate. The fact that they are made payable at a future time is immaterial. The dividend to which the life tenant may be entitled as income, can only be that which the company declares after that relation is acquired. In this case the dividend represented profits, or income, but had become a debt before the will took effect." It was held that the dividend belonged to the estate of the testator in whose name it stood when declared and not to the widow during whose life tenancy it was payable. And the court added that he became the legal owner of the dividend on the day when it was declared although it remained unpaid.

In *Hopper* v. *Sage* (1889) 112 N.Y. 530, 20 N.E. 350, the defendant had agreed with a broker representing the plaintiff for the purchase from the broker of certain stock to be delivered within thirty days. There was a provision in the agreement that the defendant was to have "all dividends or extra dividends declared during the time." A dividend had already been declared upon the stock payable thereafter, which was within the thirty-day period. It was held

the defendant was not entitled to the dividend although by the rules of the New York Stock Exchange he would have been.

The views above expressed are clearly in conformity with conclusions reached in other New York decisions, such as *Boardman* v. *Lake Shore & Michigan Southern Ry. Co.* (1881) 84 N.Y. 157, 179; *Jermain* v. *Lake Shore & Michigan Southern Ry. Co.* (1883) 91 N.Y. 483, 492; *Hill* v. *Newichawanick Co.*, 8 Hun (N.Y.) 459; *Brisbane* v. *Delaware, L. & W. R. Co.*, 94 N.Y. 204, 207; *Searles* v. *Gebbie*, 115 N.Y. App. Div. 778, 780; *Brundage* v. *Brundage*, 60 N.Y. 544; *Robertson* v. *De Brulatour*, 188 N.Y. 301, 80 N.E. 938. See also *Wheeler* v. *Northwestern Sleigh Co.*, 39 Fed. 347.

In passing it may be noted that the court in *Hopper* v. *Sage, supra,* said as to the rule of the New York Stock Exchange: "In the absence . . . of any provision in a contract of sale and purchase of stock, outside of and not subject to the rules of the Stock Exchange, the law declares that such a contract gives the dividends to the owner of the shares when the dividends were declared." It was further said: "Usage and custom cannot be proved to contravene a rule of law or to alter or contradict the express or implied terms of a contract free from ambiguity, or to make the legal rights or liabilities of the parties to a contract other than they are by the terms thereof. When the terms of a contract are clear, unambiguous and valid, they must prevail, and no evidence of custom or usage can be permitted to change them." "As between successive owners of shares of stock in a corporation, the general rule is that dividends belong to the persons who are the owners of the stock at the time they are declared, without regard to the time during which the dividends were earned, and this is true although the dividends are made payable at a future date."

14 Corpus Juris, p. 818; *Northern Central Dividend Cases*, 126 Md. 16, 94 Atl. 338, 342; *Wheeler* v. *Northwestern Sleigh Co.*, 39 Fed. 347, 349. The declaration creates an immediate debt although the dividend is made payable at a future time. *Northwestern Marble & Tile Co.* v. *Carlson*, 116 Minn. 438, 133 N.W. 1014; *Wallin* v. *Johnson City Lumber & Mfg. Co.*, 136 Tenn. 124, 188 S.W. 577; *Cogswell* v. *Second National Bank*, 78 Conn. 75, 81, 60 Atl. 1059; *Beers* v. *Bridgeport Spring Co.*, 42 Conn. 17, 24.

Concerning these statements of the general law, the remaindermen make two main contentions. They say, first, that these. decisions do not refer to provisions such as we have in the present case, where the dividends are made payable to "stockholders of record on the books of the company," at a future date. It will be seen that in the *Ford* v. *Snook* case the court had almost identical language before it in the declaration of the directors, but reaffirmed the general rule without conceding any distinction. As to the other cases cited, we are not informed in all of them exactly what the language used by the directors was, but if there was a distinction to be drawn between dividends simply payable at a future date and those payable to stockholders of record at a future date, it is significant that it does not appear in any of the numerous decisions on the question. The decision in *Ford* v. *Snook* is in effect a specific denial that there is any such distinction in that State, for it says of the language above quoted, that it is used merely for the "convenience of the corporation and to protect it in paying to the persons who appear on its books," and does not affect the title.

The second claim made by the remaindermen is that in these decisions, the courts of New York do not appear to have made any reference to the cor-

porate domicil of the corporation whose dividends were under consideration. We are not warranted in saying that corporate domicil was not considered, simply because it does not affirmatively appear in the decision that it was. Moreover, the courts of any State may assume, if a different claim is not made on the trial, that the law of the foreign State is the same as that of the home State. *Lockwood* v. *Crawford*, 18 Conn. 361, 370; *Adams* v. *Way*, 33 Conn. 419, 432; *Hoxie* v. *New York, N. H. & H. R. Co.*, 82 Conn. 352, 73 Atl. 754; *American Woolen Co.* v. *Maaget*, 86 Conn. 234, 235, 85 Atl. 583; *McLoughlin* v. *Shaw*, 95 Conn. 102, 106, 111 Atl. 62.

If *Ford* v. *Snook* states the New York law, and we think it does, then it applies to the dividends we are considering. The court, in *Hopper* v. *Sage, supra*, further said as to this question, that "it has been held a number of times in this court that when a dividend is declared it belongs to the owner of the stock at that time. . . . The declaration of a dividend is in legal contemplation a separation of the amount thereof from the assets of the corporation, which holds such amount thereafter as the trustee of the stockholder at the time of the declaration of the dividend." We may not assume that court overlooked a distinction which the remaindermen now attempt to make in the form of the declaration.

We hold therefore: (1) that the act of severance from corporate assets creates a dividend or income, (2) that that act is a strictly corporate act governed exclusively by the law of the corporate domicil, and (3) that in view of the law of New York the intent of the directors must be held to be that the date of the declaration should be the date of the severance in the present case. These monies therefore became on that day dividends earned and declared on the

corpus of the trust and were as to the trustee, income, in every true sense of that word. That they were no longer a part of the principal fund, but income due as a debt from the corporation, was conclusively determined by the only authority which could separate them.

It is at this point, where we find the trustee vested with this income, that the law of the corporate domicil ends and the law of the domicil of the parties begins. We are now to deal with the relationship of the parties themselves and the law of their domicil defines the status of the trustee and of the beneficiaries, interprets the will and the agreement and decides the ownership of the funds in question. *Graham* v. *First National Bank of Norfolk*, 84 N.Y. 393.

It recognizes first that while the trustee holds the legal title he is but the conduit through whom the beneficial interest is vested in another. Interpreting the will in the light of the agreement, it finds no intent on the part of the testator, to increase the principal during the continuance of the life estate. On the contrary, the entire earning capacity of the principal fund is to be devoted, so far as necessary, to the support of the widow. When the question of what was necessary for her support arose, the agreement binding the widow and all those interested in the remainder furnished the answer. As we have already pointed out, no question is made but that the remaindermen have received all of the $5,000 which belonged to them practically to the time of the termination of the life estate. Their agreement provides that after their $5,000 has been paid to them, the trustee shall pay "the balance of said income from the trust affecting said residue to the said Ella C. Bradley personally, in semi-annual payments." "And it is further mutually agreed that the true construction of said will shall

be deemed to be in accordance with the terms of this agreement so far as this agreement relates thereto, and that so far as they may lawfully do so, the parties hereto will carry the provisions of this agreement and its purpose and intent into full effect."

It follows that in order to carry out the intent of the testator thus conclusively determined, the widow must be held entitled to all income above the $5,000 already paid, which was vested in the trustee before the termination of the life estate, and that necessarily included these dividends.

Moreover, since we must assume that these dividends were declared out of past earnings, this money represents the definite result of the earning power of the principal fund before the death of the life tenant. It was the very thing which the testator contemplated and the will and agreement provided, should go to the widow, and it left the principal fund belonging to the remaindermen intact as was intended. The separation being made, its character as earnings and income cannot by any process of logical reasoning be changed so as to treat it as a part of or an accretion to the principal. When these funds were severed from the principal by the act of the corporation, their character was irrevocably settled as dividends or income, and they vested in the trustees as dividends on the day of the declaration as truly as though the corporation had given them its note for the amount payable on the days fixed for the actual payment.

The argument of counsel for the remaindermen that given a Connecticut will, a Connecticut agreement, a Connecticut trustee and Connecticut parties, rights must be determined by the law of Connecticut, is a correct general statement, but the application attempted to be made of it is too broad. It cannot

reach into New York and say there was no severance on the day of declaration, when the New York law and the New York directors say as a fact that there was a severance. That would be to deny an established fact. Nor does our law furnish any legal justification for treating these monies from the time of this severance, as still a part of the stock or principal fund, or to ignore the declaration altogether or change its legal intent and effect where made.

The company parted with its title to these monies on the day of the declaration and passed it to the Connecticut trustees, and it is in recognition of this established fact that we turn to our law to determine the beneficial owner. This procedure accords with that followed in *Graham* v. *First National Bank of Norfolk,* 84 N.Y. 393

Thus considered, we can give full assent to the statement of counsel for the remaindermen that "the courts of this country have always considered that conflicting claims to corporate dividends arising between life beneficiaries and remaindermen, between vendor and vendee, and between pledgor and pledgee, are governed by the law which governs the trust, sale or pledge, as the case may be, and not the law of the State in which the corporation is incorporated." The case cited, *Graham* v. *First National Bank of Norfolk, supra,* establishes this very point. The action of the Virginia bank in paying the wife's dividend to the husband was sustained by the application of the law of the corporate domicil, and could not be affected by the law of Maryland, in which the husband and wife lived, which law did not permit such payment. When the money reached Maryland, then for the first time, the law of Maryland applied, and determined the rights of the parties as between themselves.

Counsel further says in the brief: "The Connecticut

courts . . . when they have been confronted with the question of the disposition of a stock dividend or an extraordinary cash dividend, whether declared by a Connecticut or a New York corporation, or any other foreign corporation, have uniformly been guided by the declaration of the directors." This is a clear recognition of the binding force of the intent of the directors drawn from their own declaration. No difference in principle can be perceived whether their action be the declaration of a claimed stock dividend, extra cash dividend, regular cash dividend, or a deferred payment dividend.

This doctrine that the declaration of the dividend by the directors will be recognized as conclusive upon its character, has received affirmance in this State in at least two cases. In *Spooner* v. *Phillips,* 62 Conn. 62, 24 Atl. 524, various dividends had been declared by the Adams Express Company, a New York corporation. In a dispute as to the ownership of the dividends between the remaindermen and life tenants residing in this State, the question turned upon the character of the dividend. The action and declaration of the directors was accepted as final and conclusive upon this question, and the rights of the parties were then decided by the law of Connecticut, starting with the accepted fact. The court made an extended quotation from *Gibbons* v. *Mahon,* 136 U.S. 549, 10 Sup. Ct. 1057, and concluded with these words: "When he [the testator] has given no special direction upon the question as to what shall be considered principal and what income, he must be presumed to have had in view the lawful power of the corporation over the use and apportionment of its earnings, and to have intended that the determination of that question should depend upon the regular action of the corporation with regard to all its shares." The intent

of the directors, shown by their language and the law under which they were acting, determines the character of the dividend. Whether or not they intended in the present case to separate the dividends from the corporate assets on the day they declared the dividends, we must accept that intent as final and settle our question of ownership in the light of that fact. "We are satisfied by principle and by authority, that the declaration of the dividends in question must be interpreted and given the effect which the directors evidently intended it to have." *Richter & Co.* v. *Light, supra,* 370.

*Richter & Co.* v. *Light* was decided strictly upon this rule, and we think the reasoning in that case is sound. In this State, unless the contrary appears, the declaration of a dividend payable to the stockholders who are of record on a named future date, establishes the intent to be that the separation shall not be made until that date, and those stockholders only vested with the title; but we are not permitted to deny a different conclusion which has been reached in another jurisdiction where we are dealing with a declaration made in that jurisdiction. We are satisfied that in the State of New York such a declaration as the one we are considering is not intended to postpone the vesting of the title, but its only purpose is to serve the convenience and to protect the corporation. In Cook on Corporations (8th Ed.) Vol. 2, at pages 1864 and 1865, it is said that where the declaration makes the dividend payable to stockholders of record of a later date than the date of the declaration, "the dividend belongs to the vendee, even though he purchased after the dividend was declared, but before the date when it was payable to stockholders of record," citing as authority for this statement, *Richter & Co.* v. *Light* (1922), and adding,

"*Contra* 205 N.Y. App. 194 (1923)," which is *Ford v. Snook.* It thus appears that the latter case is recognized and considered as opposing the doctrine of *Richter & Co.* v. *Light,* which was decided the previous year.

These directors used language which had been judicially determined in that State to mean a present vesting, thus showing their intent to be in accord with that ruling.

We must therefore hold, under the circumstances of the present case, that the vesting took place the day the dividends were declared. It should be noted that in the present instance, this conclusion effectuates the real intent of this testator as our Connecticut rule would not do, by giving the earnings of the principal fund to the widow rather than make it an accretion to the principal for the benefit of the remaindermen.

To the questions propounded to us we answer: As to (1) and (2), the dividends belong to the estate of Ella C. Bradley, and as to (3), the Court of Probate did not err in so deciding and in directing the trustee to pay these monies to the representative of her estate.

No costs will be taxed to either party in this court.

In this opinion the other judges concurred.