## HENRY WEHRHANE, EXTR., ET AL.

### (Appeal from Probate)

Superior Court          Fairfield County          File No. 68841

MEMORANDUM FILED AUGUST 23, 1945.

*Cummings & Lockwood*, of Stamford, for the Plaintiffs.

*Marsh, Day & Calhoun*, of Bridgeport, for the Defendants.

O'SULLIVAN, J.   The plaintiffs are the executors of the will of William C. Peyton, late of Greenwich, deceased.   They have appealed in their representative capacity from an order of the probate court disallowing those items in their consolidated account which allocate to income and principal certain distributions in the form of cash dividends received by them from Peyton-Dupont, Inc., from 1936 to 1941, inclusive.   Of the distributions, which aggregated $571,178.71, it is conceded that $156,313.98 represents income.   The narrow issue to be met is whether the remaining $414,864.73 should be allocated to principal, as the executors maintain, or to income.   The case is but another illustration of the interminable conflict waged between beneficiary and remainderman over the alleged encroachment upon each other's rights.

William C. Peyton died on April 4, 1936.   He left a will creating a residuary trust, the net income of which his widow was to enjoy for life and upon her death the trustees, who were also nominated and qualified as executors, were to turn the entire fund over to themselves as remaindermen.   The inventory they filed shows a gross estate of $792,686.58, of which these three items account for $706,871.42:

| | |
|---|---|
| 20,000 shares of Peyton-DuPont, Inc., capital stock | $450,000.00 |
| 12,362 shares of Peyton-DuPont Securities Company capital stock | 142,163.00 |
| Notes of Peyton-DuPont, Inc., to the order of W. C. Peyton, with accrued interest | 114,708.42 |

During his life, Peyton's activities had centered upon the development of the Standard Stoker Company, Inc., a concern engaged in the manufacture of stokers for steam locomotives.   At his death, his financial interest in the company was indirect, being traceable, as it was, through the devious medium of ownership of shares of stock in Peyton-DuPont, Inc., and Peyton-DuPont Securities Company, a medium that followed a corporate reorganization in 1931, affecting the companies just mentioned and The Standard Stoker Company, Inc.

It is unnecessary to detail all of the intricate devices of this reorganization.   The following statement will be ample, I trust, to background the problem of the appeal.   Prior to April, 1931, the stoker company and the securities company were going Deleware corporations and in each, Peyton, as well as his wife, was a substantial stockholder.   The former

corporation, as has been stated, was engaged in manufacturing; the latter held 61,637 of the outstanding 97,944 shares of stock in the stoker company and its further financial interests involved various other enterprises, such as a marble quarry in Maryland, a ranch in the West, and an office building in Philadelphia. The plan of reorganization contemplated, among other steps, the following, all of which were eventually taken: a new corporation, to be called Peyton-DuPont, Inc., was to be organized under Delaware law and was to take over all of the assets of the securities company except the stoker stock; it was also to assume liabilities of the securities company to the amount of $389,027.93, representing various payables and a reserve for uncollectible interest; the securities company was to acquire, through an exchange of its own unissued stock, all shares of stock in the stoker company held by others than itself; the stock of the securities company was to be held by Peyton-DuPont, Inc., and by those who, as just related, were to exchange their stoker stock for that of the securities company; and the stock of Peyton-DuPont, Inc., was to be held by the former stockholders of the securities company. The up-shot of the foregoing was that Peyton and his wife came into control of Peyton-DuPont, Inc., which, with the Peytons, came into control of the securities company, which in turn owned all of the stock of the stoker company.

The following is a summary of assets acquired by Peyton-DuPont, Inc.:

| | |
|---|---:|
| Cash in banks and on hand | $ 24,784.95 |
| Loans | 1,193,141.00 |
| Accounts receivable | 290,560.90 |
| Investments | 557,920.81 |
| Miscellaneous items | 4,004.93 |
| 11,900 shares of Peyton-DuPont Securities Co. | 1,502,900.22 |
| Total assets | $3,573,312.81 |

As previously stated, the only asset retained by the securities company was its stock in the stoker company consisting of several thousand shares carried on its books at $253,187.09. One of the steps of reorganization was to increase this figure to $1,502,900.22, which reflected the value of the 11,900 shares of stock in the securities company acquired by Peyton-DuPont, Inc., as shown in the summary set forth above.

The liabilities of the securities company assumed by Peyton-DuPont, Inc., aggregated $380,027.93 and the excess of assets over liabilities ($3,193,284.88) was disposed of in this fashion: a credit of $1,690,384.66 (representing the excess over liabilities of all assets except that of the 11,900 shares of the stock of the securities company) was entered in the capital stock account of Peyton-DuPont, Inc., entitled "Capital Stock Issued." On the same day that the transfer was made, the directors of Peyton-Dupont, Inc., adjusted the capital stock account of $1,690,384.66 to $575,000.00, and a corresponding credit of $1,115,384.66 was entered in an account entitled "Loans and Investment Adjustment Reserve", the purpose being, as expressed in the directors' resolution, "to adjust the capital stock of the company to the actual value of its assets." The remainder of the excess, namely, $1,502,900.22 (representing the value of the 11,900 shares of stock in the securities company) was credited to an account entitled "Paid In Surplus"

The liabilities set up by Peyton-DuPont, Inc., took this initial form:

| | | |
|---|---|---|
| Accounts payable | $ 299.45 | |
| Notes payable | 313,000.00 | |
| Accrued salaries | 718.75 | |
| Accrued interest payable | 272.82 | |
| Reserve for uncollectible interest | 65,736.91 | |
| | $380,027.93 | $ 380,027.93 |
| Loan and investment reserve | | 1,115,384.66 |
| Capital stock | | 575,000.00 |
| Paid-in surplus | | 1,502,900.22 |
| Total liabilities | | $3,573,312.81 |

The first dividend declared by the stoker company subsequent to the reorganization was on July 1, 1931, and thereafter other dividends followed with more or less regularity, until Peyton-DuPont, Inc., was liquidated and dissolved on August 1, 1941. Up to December 31, 1935, the total of such dividends received by Peyton-DuPont, Inc., amounted to $399,192.75 and its books showed, on that date, an earned surplus of $213,576.74. Peyton, it will be recalled, died on April 4, 1936. Article Fifth of his will sets up the trust in question, the fund to include all the stock of a proposed corporation to which his shares of stock in Peyton-DuPont, Inc., and the

securities company were to be transferred. As an explanation for passing the remainder to the present plaintiffs in their individual capacity, he remarks that "the members of my immediate family neither need nor desire financial provision in the disposition of my estate" and then, to justify his bounty to the remaindermen, he adds that he wishes to evidence to those with whom "I have been associated my confidence in them and my appreciation of their cooperation with me in the development of the enterprise (the stoker company)."

Another paragraph of Article Fifth of the will reads: "It is further my desire that my said Executors and Trustees, in exercising their control of The Standard Stoker Company, Inc. should endeavor to cause that company and said controlling corporations (Peyton-DuPont, Inc., and the securities company), to distribute currently by way of dividends on their stock, *all of the earnings of the stoker enterprise,* over and above such amounts as may be retained in the exercise of reasonable business caution as necessary working surplus."

From 1936 to 1941, inclusive, Peyton-DuPont, Inc., received $1,669,351.50 as its share of the stoker company dividends and, during the same years, declared dividends of its own to the amount of $1,418,571.09. However, during this same period and notably in 1936, 1937, 1938 and 1939, Peyton-DuPont, Inc., wrote down or off as worthless several of its assets to the extent of about two million dollars. The result of its fiscal activities from 1931 to 1941, when it was dissolved, is shown in this summary:

| | |
|---|---:|
| Capital stock (as increased in 1937 by the issuance of additional stock of $467,093.30) | $1,042,093.30 |
| Paid-in surplus | 1,502,900.22 |
| | $2,544,993.52 |
| Capital assets at dissolution | 1,515,824.88 |
| Extent to which capital assets were reduced | $1,029,168.64 |

Of the total dividends of $1,418,571.09 declared by Peyton-DuPont, Inc., Peyton's executors received $571,178.71, and of this they concede that $156,313.98 represents income. But they do urge that the balance of $414,864.73 should be allotted to principal because that sum, they say, defines the

amount which the dividends in question contributed to bring about the ˙$1,029,168.64 reduction of capital assets, or, to express it differently, because $414,864.73 of the dividends came from capital.

For many years past, the State of Delaware has permitted the declaration of dividends from paid-in surplus (Delaware Corporation Law, §34 [Del. Rev. Code (1935) §2066]). The dividends when declared by Peyton-DuPont, Inc., were not entered in the paid-up surplus account but were charged against earned surplus, which, because of its inability to support them, immediately developed a substantial deficit that remained until liquidation when it was wiped out by an appropriate entry against paid-in surplus. Although the legality of the procedure pursued by the directors must be tested by the law of Delaware, the ownership of the dividends in the instant case is governed by the law of Connecticut where Peyton had his domicile and where his estate is being administered. *Union & New Haven Trust Co. vs. Watrous,* 109 Conn. 268, 286.

With respect to the allocation of dividends received for trust purposes, we have adopted the Massachusetts rule, admittedly one of expediency and not of logic. The rule makes the character of the dividend the test. Cash dividends should be regarded as income, and the stock dividends capital. *Smith vs. Dana,* 77 Conn. 543, 548. No one has ever claimed for the rule that its "application would accomplish exact justice in all cases. What was claimed was, that some clear, intelligible and workable rule was a necessity, and that the difficulties in the way of stating any other practical rule were so insurmountable as to render the chosen one, if employed with a due regard for the substance and intent of the vote of declaration, the fairest and best for general use, all things considered, which could be devised." *Boardman vs. Boardman,* 78 Conn. 451, 455. If, then, the rule is to be followed, these ordinary cash dividends—for so they must be characterized—should be regarded as income. The rule, however, is subject to exceptions. *Union & New Haven Trust Co. vs Taintor,* 85 Conn. 452. And it is the plaintiffs' claim that the instant case is one of these rarities.

Of dividends declared from surplus assets, only those which represent earnings may rightfully be allocated to income. Necessarily, all other must come from capital and, hence, pass to principal. For earnings are not synonymous with surplus,

which may arise from at least four sources. It may be a paid-in surplus, of which Peyton-DuPont, Inc., at organization, is an illustration. Surplus may embrace the gain accruing upon the retirement of a corporation's own securities, purchased in the market or elsewhere at a price below that at which they were issued; it may include the increase which a reappraisal of its physical or intangible assets demonstrates they possess beyond the value at which they have previously been carried; and, of course, it may reflect earnings which from time to time have been made.

It had been said in *Smith vs. Dana, supra, p.* 554, that "surplus *in any form*" (italics added) is not capital but this, I fear, was an inadvertent statement not designed to be as comprehensive as the words would appear to indicate, and it was later clarified, in a negative sort of way, by the observation that "in this State and elsewhere it is only to surplus earnings declared in cash that the character of income attaches." *Bulkeley vs. Worthington Ecclesiastical Society,* 78 Conn. 526, 532. Conceding, as one must, that the disputed amount ($414,864.73) did not come from earnings of Peyton-DuPont, Inc., it would appear at first blush that perhaps this *may be* one of those exceptional cases whose existence is constantly conceded but seldom, if ever, encountered, when applying the Massachusetts rule.

The basic weakness of such a conclusion, however, is that it is reached through the conventions of accountancy while it totally ignores the intention of the testator. The rule as to allocation always yields to the expressed wishes of a donor, who, when founding a trust, has it within his lawful power to pass on to beneficiaries dividends that may deplete capital as well as those emanating from earnings.

Peyton's intent is to be sought in what he said, in the light of the circumstances surrounding him when he executed his will in 1934. *New Britain Trust Co. vs. Stoddard,* 120 Conn. 123, 126. At that time, with the assistance of his wife, he dominated the three corporate entities of which the stoker company was the money-maker. The securities company was merely a holding corporation, while Peyton-DuPont, Inc., burdened with interests in a quarry, a ranch, and a business property, which were proving to be nothing but outlets for constant financial drain, could look only to dividends received from the stoker company to provide an operating income. The

possibility of revenue from any source other than that of the stoker company was negligible and Peyton must have been well aware of this when visualizing the extent of the beneficiary's enjoyment of the proposed trust.

Commenting on his gift to the remaindermen, he says, "It is my wish to so dispose of my interests as to leave the control and direction of The Standard Stoker Company, Inc. in the hands of those who have been associated with me in its development, and, at the same time, to evidence to those with whom I have so associated my confidence in them and my appreciation of their cooperation with me." His main solicitude, amply evident in his will, was for a continuance of the success of the stoker company and to attain that end, as well as to show his gratitude, he justified his gift to the plaintiffs.

Then he incorporates in his will a significant provision which clarifies the disposition he had in mind of dividends which, he foresaw, might be declared by the stoker company during the lifetime of the beneficiary of the trust he was about to create. "It is my desire", he says, "that my executors and trustees, in exercising their control of The Standard Stoker Company, Inc. should endeavor to cause that company and said controlling corporations (Peyton-DuPort, Inc., and the securities company), to distribute currently by way of dividends on their stock, all of the earnings of the stoker enterprise, over and above such amounts as may be retained in the exercise of reasonable business caution as necessary working surplus." This, it seems to me, speaks most eloquently of his purpose and intent. Regardless of the meanderings they might take through corporate channels, dividends of the stoker company were to be distributed as earnings of that concern. He knew, of course, that under existing circumstances they would eventually emerge, if at all, as dividends of Peyton-DuPont, Inc., or the securities company, but whatever the form might be, they were to represent the earnings of the stoker company and he wished his wife to enjoy them. Indeed, Peyton-DuPont, Inc., as well as the securities company, was to serve merely as a conduit through which the stoker dividends were to pass unchecked save when the demands of reasonable business caution required otherwise. And this is substantially what happened, for with this formula in mind, the directors of Peyton-DuPont, Inc., of whom three, after Peyton's death, were his executors, proceeded to pass along to their stockholders in the form of

dividends those distributions reaching their corporate treasury from the earnings of the stoker company. The dividends of the stoker company so received and those thereafter declared by Peyton-DuPont, Inc., are shown in this table:

|  | Stoker company dividends received by Peyton-DuPont, Inc. | Dividends declared by Peyton-DuPont, Inc. |
|---|---|---|
| 1936 | $  290,322.00 | $    95,200.00 |
| 1937 | 435,483.00 | 375,389.00 |
| 1938 | 145,161.00 | 144,917.75 |
| 1939 | 290,322.00 | 296,289.19 |
| 1940 | 362,902.50 | 361,982.25 |
| 1941 | 145,161.00 | 144,792.90 |
|  | $1,669,351.50 | $1,418,571.09 |

It is clear to me that his intention was to have the beneficiary enjoy as income such amounts as Peyton-DuPont, Inc., would receive from the earnings of the stoker company, even though, by following this plan, the conventions of accountancy might demonstrate that the capital assets of Peyton-DuPont, Inc., would suffer thereby. This construction of his intent is fortified by section 7 of Article Sixth of his will wherein he states that "all stock dividends received upon any stocks held by my executors or trustees shall be capital and not income." By indirection, at least, he indicates that cash dividends, whatever the source, should be deemed income. The directors of Peyton-DuPont, Inc., construed his wishes to this effect, for with but few exceptions, they passed along within a day or two of their receipt the dividends that came from the stoker company, as Peyton had expressed the hope they would. Nor, I repeat, did they look to paid-in surplus to bear the charge. They applied it to the earned surplus account, which is not without its significance as indicative of the substance and intent of the vote of declaration. The declaration of a dividend must be interpreted and given the effect which the directors intended it to have. *Union & New Haven Trust Co. vs. Watrous, supra*, p. 289.

It is further urged that Article Third of the will provides that the life tenant shall be paid the "net income" of the trust. The plaintiffs would warp this into meaning that the testator intended that only earnings of Peyton-DuPont, Inc., should be enjoyed by the beneficiary. What Peyton had in mind, however, in using the expression "net income", was that his wife

was to have the income after the administrative expenses of the trust were met.

But even were Peyton's intent not discernible, as it appears to be, I question whether this case would prove to be an exception to our rule concerning allocation. "Whether more or less exceptions are to be recognized, it is clear that no appeal can be successfully made for any which does not find its justification in a demonstration clearly made, that the general rule would under the conditions work inequity and that some other determination of the conflicting claims would lead to results more in consonance with the strict rights of the parties." *Boardman vs. Boardman, supra,* p. 456.

After analyzing all of the activities of the wattled financial structure and after looking with an equitable eye through the form to the substance of things, I will do no injustice on the record before me by allocating to income what Peyton intended and what, after all, were the earnings of an operating company, even though, as they passed from one corporate entity to another, the rules of accountancy removed from them the tag of earnings and substituted for it the label of capital.

The appeal is dismissed.